# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### TYLER DIVISION

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington corporation, HEWLETT-PACKARD COMPANY, a Delaware corporation, NETGEAR, INC., a Delaware corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>    Defendant. | Case No. 6:06 CV 00549 LED |
| COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>    Counterclaimant,<br><br>  v.<br><br>MICROSOFT CORPORATION, a Washington corporation, HEWLETT-PACKARD COMPANY, a Delaware corporation, NETGEAR, INC., a Delaware corporation,<br><br>    Counterdefendants. | |

**CSIRO'S OPPOSITION TO MARVELL'S MOTION TO STAY PROCEEDINGS AND, IN THE ALTERNATIVE, DISQUALIFY DEFENDANT'S COUNSEL**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    FACTUAL BACKGROUND ............................................. 3

       A.    TIMELINE OF EVENTS ............................................. 3

             1.    2002–2004: Townsend's development and implementation
                   of a licensing strategy for CSIRO's '069 Patent. ...................... 3

             2.    January 2005: Marvell signs the first indemnity agreement ................ 4

             3.    February 2005: CSIRO sues to enforce the '069 patent. ................. 4

             4.    May 2005: Marvell's forbearance agreement with
                   Customer A and the manufacturers' coordinated suits
                   against CSIRO. ............................................................ 5

             5.    June 2005: CSIRO advises Marvell that it does not need a
                   license and will not be sued. ............................................ 5

             6.    Late 2005: Marvell begins to send patent work to
                   Townsend. ................................................................. 6

             7.    September 2006: Marvell signs another indemnity
                   agreement; CSIRO files answer and counterclaims in
                   Microsoft case. ........................................................... 7

             8.    October 2006: Marvell suddenly resumes sending patent
                   work to Townsend; Customer A makes indemnity tender to
                   Marvell. .................................................................... 8

             9.    December 2006: CSIRO files the Toshiba case. ...................... 8

             10.   January 2007: Customer B tenders to Marvell under its
                   indemnity agreement. .................................................... 9

             11.   March 2007: Marvell seeks license from CSIRO, informs
                   Townsend for the first time of the indemnity agreements,
                   declares Townsend to be in conflict, sues Townsend for
                   malpractice, and ends relationship between Marvell and
                   Townsend. ................................................................. 9

             12.   May through July 2007: Marvell sues CSIRO in this Court,
                   seeks disqualification of Townsend through the California
                   state court, and files these motions. ................................. 10

       C.    DISQUALIFICATION WOULD BE EXTREMELY PREJUDICIAL TO
             CSIRO ......................................................................... 13

III.   MARVELL'S MOTION TO STAY SHOULD BE DENIED ..........................................14

    A.    THE CUSTOMER SUIT DOCTRINE IS INAPPLICABLE ...................................14

        1.    The customer plaintiffs are not mere resellers of Marvell products ...........................................................................14

        2.    Marvell's declaratory relief action will not resolve all claims against the Marvell customer plaintiffs.........................16

        3.    Marvell otherwise fails to satisfy the basic requirements for application of the customer suit exception ...................................17

    C.    A "PARTIAL" STAY WILL BE UNDULY PREJUDICIAL TO CSIRO............................18

IV.   MARVELL'S ALTERNATIVE REQUEST TO DISQUALIFY TOWNSEND SHOULD BE DENIED...........................................................................19

    A.    THE PARTY SEEKING DISQUALIFICATION BEARS A HEAVY EVIDENTIARY BURDEN .......................................................................19

    B.    THE RULES GOVERNING CONCURRENT CLIENTS ARE INAPT.................................20

        1.    Townsend's representation of CSIRO is not directly adverse to Marvell .............................................................21

        2.    Marvell's indemnity agreements with customers are insufficient to show direct adversity.........................................25

        3.    Any conflict is of Marvell's own making.................................27

        4.    CSIRO will suffer considerable and undue prejudice if Townsend is disqualified ........................................................31

    C.    TOWNSEND'S PRIOR WORK FOR MARVELL IS NOT SUBSTANTIALLY RELATED TO THIS LITIGATION AND NO RELEVANT CONFIDENTIAL INFORMATION WAS DISCLOSED TO TOWNSEND ......................................32

        1.    Marvell fails to support its claim of substantial relationship with any specific facts ....................................................33

        2.    Townsend's work for Marvell and the CSIRO litigation are not substantially related ....................................................34

        3.    Townsend possesses none of Marvell's relevant confidential information ....................................................37

V.   CONCLUSION ..............................................................................43

## TABLE OF AUTHORITIES

### Cases

A.P.T. Inc. v. Quad Enviromential Technologies, Corp.,
  698 F. Supp. 718 (N.D. Ill. 1988)........................................................................17

Abney v. Wal-Mart,
  984 F. Supp. 526 (E.D. Tex. 1997)..........................................................19, 38, 41

Air Products and Chemicals, Inc. v. MG Nitrogen Servs., Inc.,
  133 F. Supp. 2d 354 (D. Del. 2001) .....................................................................15

AMBAC Indemnity Corp. v. Bankers Trust Co.,
  546 N.Y.S. 2d 265 (1989)....................................................................................23

American Sterilizer Co. v. Surgikos, Inc.,
  24 U.S.P.Q.2d 1547, 1992 WL 332102 (N.D. Tex. 1992) ....................................41

Aventis Pharma Deutschland GMBH v. Lupin Ltd.,
  403 F. Supp. 2d 484 (E.D. Va. 2005) ...................................................................14

BBC Intern. Ltd. v. Lumino Designs, Inc.,
  441 F. Supp. 2d 438 (E.D.N.Y. 2006)......................................................15, 17, 18

Biax Corp. v. Fujitsu Computer Systems Corp.,
  2007 WL 1466638 (E.D. Tex. May 16, 2007) .......................................34, 36, 38

Board of Regents of the University of Nebraska v. BASF Corp.,
  2006 WL 2385363 (D. Neb. 2006).......................................................................27

Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court,
  60 Cal. App. 4th 248 (1997) ................................................................................23

Carbo Ceramics, Inc. v. Norton-Alcoa Proppants,
  155 F.R.D. 158 (N.D. Tex. 1994).........................................................................31

Carlyle Towers Condominium Association, Inc. v. Crosslands Savings, FSB,
  944 F. Supp. 341 (D.N.J. 1996)............................................................................29

Central Milk Producers Co-op. v. Sentry Food Stores, Inc.,
  573 F.2d 988 (8th Cir. 1978)................................................................................41

Church of Scientology of California v. McLean,
  615 F.2d 691 (5th Cir. 1980) ...............................................................................20

Ciena Corp. v. Nortel Networks, Inc.,
  2005 WL 1189881 (E.D. Tex. 2005).....................................................................16

Codex Corp. v. Milgo Elec. Corp.,
  553 F.2d 735 (1st Cir. 1977)................................................................................15

Cox v. American Cast Iron Pipe Co.,
   847 F.2d 725 (11th Cir. 1988) ...................................................................41

Crowe v. Smith,
   151 F.3d 217 (5th Cir. 1998) .....................................................................19

Dentsply Int'l, Inc. v. Kerr Mfg. Co.,
   734 F. Supp. 656 (D. Del. 1990) ...............................................................17

Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
   646 F.2d 1020 (5th Cir. 1981) ..............................................................20, 35

Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.,
   142 F. Supp. 2d 579 (D. Del. 2001) ..........................................................29

F.D.I.C. v. U.S. Fire Ins. Co.,
   50 F.3d 1304 (5th Cir. 1995) .....................................................................20

Felix v. Balkin,
   49 F. Supp. 2d 260 (S.D.N.Y. 1999) .........................................................20

Florida Insurance Guaranty Association, Inc. v. Carey Canada, Inc.,
   749 F. Supp. 255 (S.D. Fla. 1990) ............................................................33

Gen-Cor, LLC v. Buckeye Corrugated, Inc.,
   111 F. Supp.2d 1049 (S.D. Ind. 2000) ......................................................29

Gilbert v. Knoxville Int. Energy Exposition,
   547 F. Supp. 53 (E.D. Tenn. 1982) ...........................................................23

Glover v. Libman,
   578 F. Supp. 748 (N.D. Ga. 1983) ............................................................42

Gould, Inc. v. Mitsui Mining & Smelting Co.,
   738 F. Supp. 1121 (N.D. Ohio 1990) ........................................................29

Government of India v. Cook Industries, Inc.,
   569 F.2d 737 (2d Cir. 1978) ......................................................................35

Hertz Corp. v. Caulfield,
   1992 WL 53610 (E.D. La. March 10, 1992) .............................................41

Hollenbeck v. Boivert,
   330 F. Supp. 2d 324 (S.D.N.Y. 2004). ......................................................20

In re American Airlines,
   972 F.2d 605 (5th Cir. 1992) ........................................................19, 32, 35

In re Dresser Indus., Inc.,
   972 F.2d 540 (5th Cir. 1992) .....................................................................19

In re Metoprolol Succinate Patent Litigation,
   2005 WL 1661509 (E.D. Mo. July 8, 2005) .............................................41

In re Pioneer Hi-Bred Int'l, Inc.,
    238 F.3d 1370 (Fed. Cir. 2001) ........................................................................................19

In re Snyder,
    472 U.S. 634 (1985) ........................................................................................................19

Kahn v. General Motors Corp.,
    889 F.2d 1078 (Fed. Cir. 1989) ...........................................................................15, 16, 17

Katz v. Lear Siegler, Inc.,
    909 F.2d 1459 (Fed. Cir. 1990) ...........................................................................14, 15, 16

Klein v. Churchill Coal Corp.,
    612 F. Supp. 247 (S.D.N.Y. 1985) ..................................................................................29

Metropolitan Life Ins. Co. v. Syntek Finance Corp.,
    881 S.W.2d 319 (Tex. 1994) ...........................................................................................32

Milone v. English,
    306 F.2d 814 (D.C. Cir. 1962) .........................................................................................41

NCNB Texas Nat. Bank v. Coker,
    765 S.W.2d 398 (Tex. 1989) ...........................................................................................32

Panduit Corp. v. All States Plastic Mfg. Co.,
    744 F.2d 1564 (Fed. Cir. 1984) .......................................................................................31

Power Mosfet Technologies., L.L.C. v. Siemens AG,
    2002 WL 32785219 (E.D. Tex. Sept. 30, 2002) ........................................................34, 37

Redd v. Shell Oil Co.,
    518 F.2d 311 (10th Cir. 1975) .........................................................................................41

Rembrandt Technologies, LP v. Comcast Corp.,
    2007 WL 470631 (E.D. Tex. Feb. 8, 2007)................................................................24, 25

Research Corp. Technologies, Inc. v. Hewlett-Packard Co.,
    936 F. Supp. 697 (D. Ariz. 1996) ....................................................................................29

Richardson–Morrell, Inc. v. Koller,
    472 U.S. 424 (1985) ........................................................................................................31

Shire Labs. Inc. v. Nostrum Pharmaceuticals, Inc.,
    2006 WL 2129482 (D.N.J. 2006) ....................................................................................22

Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp.,
    2006 WL 1877078 (N.D. Ga. July 5, 2006) .....................................................................26

Spears v. Fourth Court of Appeals,
    797 S.W.2d 654 (Tex. 1990) ...........................................................................................19

Tegic Communications Corp. v. Board of Regents of the University of Texas System,
    458 F.3d 1335 (Fed. Cir. 2006) .......................................................................................16

<u>Tillotson Corp. v. Shijiazhaung Hongray Plastic Products, Ltd.</u>,
  2007 WL 1247121 (N.D. Ga. April 30, 2007) ........................................................................17

<u>Trust Corp. of Montana v. Piper Aircraft Corp.</u>,
  701 F.2d 85 (9th Cir. 1983) ...........................................................................................................41

<u>United States Fidelity & Guaranty Co. v. Bolding</u>,
  447 F.2d 462 (10th Cir. 1971) ......................................................................................................41

<u>United States v. Aleman</u>,
  2004 WL 1834602 (W.D. Tex. Aug. 12, 2004).........................................................................35

<u>Vaughan v. Walther</u>,
  875 S.W.2d 690 (Tex. 1994) .........................................................................................................41

<u>Whelen Techs., Inc. v. Mill Specialties, Inc.</u>,
  741 F. Supp. 715 (N.D. Ill.1990)..................................................................................................14

## I.    INTRODUCTION

Marvell's untimely appearance in this case is purely tactical.  Marvell learned *over two years ago*, when it asked CSIRO's principal attorneys in this litigation about the need for a license on CSIRO's patented technology, that CSIRO had no intention of affirmatively pursuing claims against chip makers, like Marvell, who manufacture *components* that do not directly infringe the CSIRO patent, but only against the manufacturers of *end products* that *do* infringe. Nevertheless, Marvell[1] has now sued CSIRO for declaratory judgment, and here seeks either to stay this case or to disqualify Townsend.  There is only one purpose for Marvell's presence here, and for this motion: to disrupt the orderly litigation of CSIRO's patent cases.  Marvell's motion should be denied, both because its purpose is entirely improper, and because Marvell utterly lacks factual or legal basis for its requested relief.

At a fundamental level, disqualifying Townsend, Townsend & Crew LLP ("Townsend"), would be hugely prejudicial to CSIRO (a stay would have the same practical effect or simply defer the disqualification issue).  Since 2002, CSIRO has utilized Townsend in its worldwide efforts to protect its patent rights.  CSIRO has incurred millions of dollars in fees working with the Townsend firm, which itself has spent thousands of hours analyzing and then litigating these complex patent issues and moving CSIRO's case forward through <u>Markman</u> and summary judgment proceedings.  Now, with critical issues already on appeal in the <u>Buffalo</u> action and matters well under way in the current actions, including an expected upcoming mediation, Marvell seeks to disrupt and delay the litigation at the eleventh hour.

Marvell claims that because it has filed its own declaratory judgment action, an action which itself may be subject to dismissal, a piece of this case must be stayed.  Such a stay would be inefficient and fragment the litigation of claims.  No defendant in the <u>Toshiba</u> or plaintiff in

---

[1]    As used herein, "Marvell" refers collectively to the moving parties: Marvell Semiconductor, Inc., Marvell Asia Pte., Ltd., and Marvell International, Ltd.  Commonwealth Scientific and Industrial Research Organization is referred to herein as "CSIRO."

the <u>Microsoft</u> case[2] uses Marvell chips exclusively (overall Marvell's chips are used in fewer than one percent of the end products at issue), so the stay requested by Marvell would not eliminate any party from these cases.  Litigation of the frozen sliver of claims against those parties would simply be deferred.  Marvell's *only* purported basis for the requested stay, the customer suit exception, is intended to facilitate the *orderly* resolution of patent claims.  It does not apply here (plaintiffs are not mere customers, but themselves manufacturers of infringing devices), and to allow such misuse by Marvell to bring disorder to the litigation would pervert the intent of the rule.

As an alleged "alternative," Marvell argues that CSIRO's attorneys should be disqualified because of a purported conflict arising years ago as a result of Marvell's own decision to utilize the Townsend firm on unrelated matters.  There is absolutely no conflict of interest here.  For more than two years, CSIRO has told Marvell that it had no intention of pursuing any claims against component makers, and two clients are not adverse merely because one sues the *customer* of another.  Marvell apparently agreed that there was no issue, because while fully aware of Townsend's representation of CSIRO in the patent enforcement matters, its in-house patent counsel began sending Townsend the work Marvell now claims gives rise to a conflict.  Marvell also relies on purported indemnity agreements between it and its customers, but it is absolutely undisputed that those agreements were never disclosed to Townsend until this March, and thus that the purported conflict was both unknown to Townsend and thrust upon it by Marvell's own actions.  Even assuming that there were any conflict (and that the "conflict" was not strategically concocted), Marvell has waived any right to assert it.  Marvell simply sat on its "claim" for over two years, and does nothing to explain the delay.

The single suspect declaration filed in support of Marvell's motion provides no concrete

---

[2]      Marvell has filed motions to stay or disqualify CSIRO's counsel in both the <u>Microsoft</u> and <u>Toshiba</u> cases.  With the exception of sections identifying the parties, the motions are identical.  Similarly, CSIRO's oppositions to those motions are identical, again with the exception of sections identifying the parties.

basis on which to grant Marvell's request.  Generalities and innuendo are insufficient to support the drastic relief Marvell seeks, yet Marvell refuses to produce even the most basic documents it claims give rise to the "conflict."  Marvell's motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

Instead of concrete facts, Marvell supports its motion with nothing more than evasive, vaguely generalities.  Most tellingly, Marvell refuses to disclose (even under the Attorney's Eyes Only provision of this Court's protective order) the patent applications it says give rise to the "conflict" here.  Much of what is set out below remained hidden until a few months ago, when Marvell filed suit against Townsend in California state court in an unsuccessful attempt to disqualify the firm from representing CSIRO in this case.  Though Marvell continues to avoid disclosing the whole picture, it is nevertheless clear that there is no substance underlying Marvell's claims—merely its desire to disrupt the '069 cases.

For the Court's convenience, a timeline summarizing the events described herein is attached as Exhibit A.

### A.   TIMELINE OF EVENTS

#### 1.   2002–2004: Townsend's development and implementation of a licensing strategy for CSIRO's '069 Patent.

In 1996, CSIRO was awarded a patent (U.S. Patent No. 5,487,069 or the "'069 patent"), entitled "Wireless LAN," which provides a technique for transmitting data at high speed and with high reliability using radio frequency signals within an indoor environment.  (Declaration of Robert Colwell ("Colwell Decl."), ¶ 3.)  In 1999, the Institute of Electrical and Electronics Engineers ("IEEE") adopted CSIRO's technology as the basis for the 802.11a wireless LAN standard.  (Id.)  The IEEE 802.11g standard (released 2003) and forthcoming IEEE 802.11n standard are also based on CSIRO's technology covered by the '069 patent.  (Id.)

In October 2002, CSIRO retained Townsend to assist it in developing and implementing a strategy for licensing the '069 patent.  (Id. ¶ 4.)  Working with and through Townsend, CSIRO approached the makers of finished products that potentially infringed its patent.  (Id.)  CSIRO

3

did not pursue the makers of *components* of such finished products, like Marvell, Intel or other chip makers.  (Id.)  CSIRO and Townsend's attempts to negotiate licenses with infringing end product manufacturers continued through 2003 and 2004.  (Id. ¶ 5.)  Those negotiations proved unsuccessful.  (Id.)

## 2.    January 2005: Marvell signs the first indemnity agreement.

Unbeknownst to CSIRO or Townsend, on January 19, 2005, Marvell signed an agreement with one of its customers, referred to in Marvell's prior filings only as "Customer A."[3]  (Declaration of Guy D. Calladine ("Calladine Decl."), ¶¶ 5, 7 & Ex. 2.)  Marvell has refused to identify Customer A, but claims that Customer A is a plaintiff in the Microsoft case.[4]  The agreement does not appear to indemnify Customer A for infringement by an *end product* containing Marvell components, but only for infringement by Marvell's *component parts*.  Such limited indemnity agreements are the standard practice in the technology industry.  (Declaration of Robert C. Colwell ("Colwell Decl."), ¶ 8.)

## 3.    February 2005: CSIRO sues to enforce the '069 patent.

Unable to reach a licensing agreement for the '069 patent through negotiation, CSIRO filed suit in this Court to enforce its patent on February 5, 2005.  (CSIRO v. Buffalo Technology (USA), Inc., No. 6:06-CV-324-LED).  The defendant in the first suit is a manufacturer of finished products that use CSIRO's patented technology with whom CSIRO had unsuccessfully attempted to negotiate a license.  (Colwell Decl. ¶ 5.)  As this Court is well aware, a Markman ruling in that case was issued on May 8, 2006, and a summary judgment order on validity and

---

[3]      As discussed below, the existence of the indemnity agreement between Marvell and Customer A would not be revealed to CSIRO or Townsend *for another two years*.  (Declaration of James G. Gilliland, Jr. ("Gilliland Decl."), ¶¶ 6-7; Declaration of Eric Janofsky (filed in support of Marvell's motion) ("Janofsky Decl."), Ex. 2.)

[4]      Marvell has refused to produce the indemnity agreements to CSIRO here, but did produce a heavily redacted version of the agreements in its California case against Townsend.  (Declaration of James M. Wagstaffe ("Wagstaffe Decl."), ¶¶ 2-4 & Exhs. 1-3; Calladine Decl. ¶¶ 5, 7-8 & Exhs. 2-3.)

infringement was issued on November 14, 2006—the latter finding that Buffalo infringes the asserted claims of CSIRO.  (Declaration of Dr. Jack Steele ("Steele Decl.") ¶ 5.)  Those rulings are now on appeal.

### 4.     May 2005: Marvell's forbearance agreement with Customer A and the manufacturers' coordinated suits against CSIRO.

On May 5, 2005, Marvell and Customer A entered an agreement to forbear from initiating legal proceedings over "possible" indemnification rights.  (Calladine Decl. ¶¶ 5-6 & Ex. 1.)  Four days later, on May 9, 2005, Customer A and a consortium of other manufacturers of finished 802.11 products filed an affirmative suit against CSIRO seeking declaratory judgment concerning the validity and scope of the '069 patent.  (Microsoft Corp. v. CSIRO, Case No. 6:06-CV-00549-LED.)  Plaintiffs in that suit, Microsoft Corporation, Apple Computer, Inc., Hewlett-Packard Company, and Netgear, Inc., include some of the largest computer companies and makers of 802.11 devices in the world.  On the same day, two other manufacturers (Intel Corporation and Dell, Inc.) filed a similar but separate declaratory judgment suit against CSIRO with the same court.  (Intel Corporation v. CSIRO, Case No. 6:06-CV-00551-LED.[5])  Marvell has not claimed any relationship to the plaintiffs in the Intel case.  Townsend represents CSIRO in both the Microsoft and Intel cases.  (Colwell Decl. ¶ 2.)

### 5.     June 2005: CSIRO advises Marvell that it does not need a license and will not be sued.

On June 22, 2005, clearly indicating Marvell's awareness of Townsend's representation of CSIRO in the '069 patent matters, Marvell had one of its outside counsel contact the firm to inquire about the possibility of licensing CSIRO's '069 technology.  (Colwell Decl. ¶¶ 6-7.)  William Anthony of the firm Orrick, Herrington & Sutcliffe LLP telephoned Townsend partner Rob Colwell, advised Colwell that he was representing Marvell, and made a formal inquiry as to whether CSIRO would grant Marvell a license under the '069 patent—a request Anthony would repeat again on two separate occasions in February 2006.  (Id.)  In each of these meetings,

---

[5]      The Microsoft and Intel cases have been transferred to this Court.

Anthony and Colwell explicitly discussed a license under the '069 patent, and on each occasion Colwell told Anthony that Marvell did not need such a license because CSIRO had no intention of bringing enforcement proceedings against wireless *component* manufacturers such as Marvell.[6] (Id.)

Colwell and Anthony also discussed the status of the <u>Buffalo</u> case—in fact, Anthony said that in his view, CSIRO and Townsend were "winning" that litigation. (<u>Id.</u> ¶ 7.) At no time during those conversations did Anthony ever tell Colwell or anyone at Townsend that Marvell might be obligated to indemnify parties to any of the litigation, object to Townsend's representation of CSIRO, or in any way suggest that Marvell was potentially adverse to CSIRO in the '069 litigation. (<u>Id.</u> ¶ 8.)

### 6.    Late 2005: Marvell begins to send patent work to Townsend.

Quite to the contrary, Marvell's subsequent conduct suggested that Marvell never believed itself to be adverse to CSIRO, or that any potential conflict might arise due to Townsend's representation of CSIRO in litigation against Marvell's customers. Townsend had for some years done some trademark registration work for Marvell.[7] (Declaration of Mark A. Steiner ("Steiner Decl."), ¶ 2 & Ex. 1.) Though the firm had previously sought additional work from Marvell, the company had repeatedly rebuffed Townsend's efforts to expand the firm's representation to include work in the patent area. (Steiner Decl. ¶ 7 & Ex. 3; Declaration of Paul C. Haughey ("Haughey Decl."), ¶ 2; Declaration of Ardeshir Tabibi ("Tabibi Decl."), ¶¶ 2-3.) In late 2005, however, that changed—Marvell began sending Townsend patent application work.

---

[6]    CSIRO has offered to license the end product manufacturers, but they have declined. CSIRO has never affirmatively sued a chip maker, but did, when sued by Intel, allege counterclaims for indirect infringement because they were compulsory in nature.

[7]    The trademark work performed by Townsend for Marvell consisted almost entirely of trademark registration and licensing. (Steiner Decl. ¶¶ 2, 4.) In the course of that work, Townsend handled a few enforcement actions, only one of which resulted in court action. (<u>Id.</u> ¶ 4.) Nothing in the trademark work relates to any of the '069 patent litigation. Townsend has never performed any other litigation work of any kind for Marvell. (<u>Id.</u> ¶ 7 & Ex. 3; Haughey Decl. ¶ 3.)

(Haughey Decl. ¶ 2; Tabibi Decl. ¶ 2.)

The new work was entirely unrelated to CSIRO's technology.  (Haughey Decl. ¶¶ 6-8; Tabibi Decl. ¶ 4.)  In the course of bringing the new work to the firm, Marvell made it perfectly clear that the company was fully aware that Townsend was representing CSIRO in the 802.11 cases.  (Tabibi Decl. ¶ 3.)  During a December 2005 meeting between Townsend attorneys Ardeshir Tabibi and Babak Sani and Marvell in-house patent counsel Eric Janofsky and Mary Fuller, Ms. Fuller explicitly discussed with Mr. Tabibi Townsend's representation of CSIRO. (Id.)  Nevertheless, Marvell never mentioned any indemnity agreement, nor did it raise the possibility of any potential adversity between Marvell and CSIRO.  (Houghey Decl. ¶ 9; Tabibi Decl. ¶ 6; Gilliland Decl. ¶¶ 4-6; Steiner Decl. ¶ 6; Colwell Decl. ¶ 8.)

Marvell's silence concerning the firm's work for CSIRO stands in marked contrast to Marvell's insistence that Townsend affirmatively address even theoretical potential conflicts concerning the firm's representation of other clients.  For example, in at least two instances where Mr. Janofsky and Marvell's other sophisticated in-house patent attorneys believed potential adversity might arise, he insisted that Townsend set up ethical walls to isolate the attorneys working on Marvell matters.  (Steiner Decl. ¶¶ 9-10; Exhs. 4-5.)  Townsend diligently and thoroughly complied with Marvell's requests.  (Id.)

In June 2006, Marvell abruptly announced that it was dissatisfied with the firm's work on patent applications and advised Townsend that it would not send the firm any new patent applications.  (Haughey Decl. ¶ 5 & Ex. 1; Steiner Decl. ¶ 8.)  For the ensuing months, Townsend's only patent work for Marvell was limited to completion of prior tasks.  (Haughey Decl. ¶ 5 & Ex. 1.)

### 7.      September 2006: Marvell signs another indemnity agreement; CSIRO files answer and counterclaims in <u>Microsoft</u> case.

On or about September 4, 2006, again without informing Townsend, Marvell allegedly entered into a second indemnity agreement with another of its customers that manufactures end products using 802.11 products.  (Calladine Decl. ¶¶ 5, 8 & Ex. 3.)  The Marvell customer,

identified only as "Customer B," is alleged to be a defendant in the <u>Toshiba</u> action.  At the end of the month, on September 22, 2006, Townsend filed CSIRO's answer and counterclaims against the <u>Microsoft</u> plaintiffs.

**8.     October 2006: Marvell suddenly resumes sending patent work to Townsend; Customer A makes indemnity tender to Marvell.**

Without any explanation for its sudden and unexpected change of position, Marvell reversed course and resumed sending new patent application work to Townsend in October 2006. According to Marvell, the new work related to patent applications involving wireless LAN products.  (Haughey Decl. ¶ 6; Tabibi Decl. ¶ 4.)  As set out in more detail below, none of the work overlapped with the subject matter of the '069 patent litigation, and at no point did Townsend acquire *any* confidential information of any utility in the '069 cases.  (Haughey Decl. ¶¶ 6-8; Tabibi Decl. ¶¶ 4-5.)

At the end of that month, on October 22, 2006, Customer A made its *second* tender to Marvell under the indemnity agreement.  (Calladine Decl. ¶¶ 5-6 & Ex. 1.)  (The date of the first tender has not been disclosed to CSIRO.)

**9.     December 2006: CSIRO files the <u>Toshiba</u> case.**

On December 22, 2006, CSIRO filed the <u>Toshiba</u> action (<u>CSIRO v. Toshiba America Info. Sys., Inc.</u>, Case No. 6:06-CV-550-LED) to enforce its '069 patent against a broader group of 802.11-compliant end product manufacturers.  At the time of the filing, Marvell never mentioned to Townsend its indemnity agreements or raised the possibility that the suit might create adversity between it and CSIRO.[8]  (Haughey Decl. ¶ 9; Tabibi Decl. ¶ 6; Gilliland Decl. ¶¶ 4-6; Steiner Decl. ¶ 6.)  None of the parties in this case are chip makers like Marvell, and CSIRO has maintained its stance (disclosed to Marvell in June 2005) of not affirmatively

---

[8]     In the course of discovery in this case, CSIRO has learned that Marvell manufactures component chips for 66 of the 6,800-plus end products—less than one percent—at issue in the '069 cases currently before this Court.  (Furniss Decl. ¶ 4.)

8

pursuing claims against component makers.[9]  (Colwell Decl. ¶¶ 6, 9.)

       **10.**     **January 2007: Customer B tenders to Marvell under its indemnity agreement.**

On January 25, 2007, Customer B tendered a claim for indemnity to Marvell under those parties' agreement.  (Calladine Decl. ¶¶ 5, 9 & Ex. 4.)  Marvell has refused to admit that it is actually obligated to any of its indemnitees, stating only that Marvell has "acknowledged the *claim* for indemnification" from one of the plaintiffs/cross-defendants here.  (Marvell's Motion to Stay Proceedings and, In the Alternative, to Disqualify Plaintiff's Counsel ("Mot.") at 21) (emphasis added).

       **11.**     **March 2007: Marvell seeks license from CSIRO, informs Townsend for the first time of the indemnity agreements, declares Townsend to be in conflict, sues Townsend for malpractice, and ends relationship between Marvell and Townsend.**

On March 12, 2007—for the first time ever—Marvell advised Townsend that it believed the conversations between Marvell's outside counsel Anthony and Townsend's Colwell, which began *more than a year-and-a-half earlier*, suggested a potential conflict of interest.  (Gilliland Decl. ¶¶ 4-5; Steiner Decl. ¶¶ 5, 11-12; Haughey Decl. ¶ 9; Tabibi Decl. ¶ 6; Colwell Decl. ¶ 6.) In a series of letters that followed, Marvell *for the first time* informed Townsend of the indemnity agreements, and Townsend responded that there was no conflict and the firm had never been informed of the purported indemnity, and questioned the timing of Janofsky's belated claim. (Gilliland Decl. ¶¶ 6-8 & Ex. 1; Janofsky Decl. Exhs. 2-4.)

On March 21, 2007, Marvell precipitously filed its tactical suit in California Superior Court, claiming that Townsend had committed malpractice by its conflict of interest.  (Gilliland Decl. ¶ 8.)  After Marvell's termination of its relationship with Townsend, the firm has ceased all work on any new matters and effected an orderly transfer of work to Marvell and its new counsel (including the files containing the patent applications Marvell claims contain its confidential

---

[9]     CSIRO brought mandatory counterclaims against Intel Corp. after that company sued *it*.

information concerning wireless LAN products).  (Haughey Decl. ¶ 10 & Ex. 1; Tabibi Decl. ¶ 7 & Ex. 1; Steiner Decl. ¶ 3 & Ex. 2.)  The winding up of Marvell work is now complete, and Marvell is no longer a Townsend client.  (Haughey Decl. ¶ 10; Tabibi Decl. ¶¶ 7, 14; Steiner Decl. ¶ 3 & Ex. 2; Declaration of David N. Slone ("Slone Decl.") ¶ 8.)

> ### 12.    May through July 2007: Marvell sues CSIRO in this Court, seeks disqualification of Townsend through the California state court, and files these motions.

In May 2007, Marvell implemented its effort to disrupt this Court's orderly handling of the related patent actions on three separate fronts.  First, on May 4, 2007, Marvell filed a separate and purely duplicative declaratory judgment action against CSIRO in this Court, seeking an order that its products do not infringe CSIRO's '069 patent.  (Marvell Semiconductor, Inc., et al. v. CSIRO, No. 6:07-CV-204-LED).  Second, on May 16, 2007, Marvell filed a motion for a preliminary injunction in the California action seeking to disqualify Townsend from representing CSIRO, including in litigation before this Court. [10]  (Calladine Decl. ¶ 2.)  And finally, on July 3, 2007 Marvell filed the motions at issue here, as well as virtually identical motions seeking the same relief in the Microsoft case.

> ### B.    TOWNSEND'S WORK FOR MARVELL DID NOT OVERLAP WITH THE SUBJECT MATTER OF CSIRO'S '069 LITIGATION IN ANY WAY

Marvell refuses to produce the patent applications it says give rise to a purported "conflict" here.[11]  (Wagstaffe Decl. ¶¶ 2–4, Exhs. 1–3.)  In conjunction with this motion, CSIRO's outside counsel, Kerr & Wagstaffe LLP, sought to review the patent applications, subject to the Attorneys' Eyes Only provision of this Court's protective order.  (Id.)  Kerr & Wagstaffe even agreed not to share the patent applications with Townsend.  (Id., Ex. 3.)  Marvell

---

[10]    Townsend opposed the motion, and on June 13, 2007 Judge Peter Busch of the California Superior Court in San Francisco County denied the motion on the grounds that it lacked authority to disqualify counsel appearing in this Court.  (Calladine Decl. ¶ 2.)  Townsend has strenuously denied Marvell's allegations and continues to oppose the frivolous suit.  (Id.)

[11]    Townsend returned all files to Marvell after Marvell sued Townsend.

10

initially indicated it might produce them, but never did.  (Id.)  Its contentions concerning the content of that work should be treated with appropriate skepticism.

In fact, there was *no* overlap between that work and this case.  (Haughey Decl. ¶¶ 2, 6-8; Tabibi Decl. ¶¶ 4-5.; Steiner Decl. ¶ 4.)  *Nothing* Townsend did for Marvell involved any of the end products at issue here, and Townsend has never had access to *any* of Marvell's confidential information of any relevance in this litigation.  (Haughey Decl. ¶¶ 2, 6-8; Tabibi Decl. ¶¶ 4-5; Steiner Decl. ¶ 4; Furniss Decl. ¶ 6; Colwell Decl. ¶¶ 6-8.)

Marvell's allegations rest entirely on a single declaration of dubious credibility from Mr. Janofsky (now Marvell's General Counsel), in which he claims that thirteen of the patent applications processed for Marvell by Townsend "involved networking and technology products, and at least four involved wireless LAN technologies." (Janofsky Decl. ¶ 19.)  Elsewhere in the declaration, Mr. Janofsky claims, the relevant "knowledge has been gained in particular through Townsend's role as Marvell's counsel for *nine* patent applications involving wireless LAN technology … ." (Janofsky Decl. ¶ 32, emphasis added.)  Whatever the number, Marvell does absolutely nothing to describe *how* that patent work relates in any way to the facts and issues in this case.

The patent applications referenced in the Janofsky declaration were for various Marvell circuits.  While Marvell provided Townsend with the technical specifications for the circuits, it did not tell Townsend (nor did Townsend ask) what the circuits would be used for.  (Haughey Decl. ¶ 8.)  It is not unusual for an applicant not to tell the patent attorney exactly how it plans to use a technology with multiple potential uses, like circuitry.  (Id.)  The generic boilerplate text inserted at Marvell's direction in each application in no way informed Townsend whether the circuits would in fact be used in wireless devices, and Townsend simply does not know whether *any* of the circuits would be used at all, much less whether they are intended for use in 802.11-compliant devices.  (Id.)  None of the patents related in any way to the technology at the heart of the '069 patent claims (subchannel modulation, interleaving, and data reliability).  (Id.)  In sum, Townsend received no information from Marvell—confidential or otherwise—relevant to the

11

CSIRO litigation.[12]

Marvell also suggests that Townsend had extensive access to Marvell personnel and was privy to the company's strategic thinking.[13]   In fact, the opposite was true.  Marvell tightly controlled Townsend's work and the flow of information between Marvell and Townsend. Marvell in-house attorneys restricted Townsend's communications with the company and strictly limited the scope of the work performed.  (Haughey Decl. ¶ 3.)  Townsend had no input into selecting what inventions would be the subject of applications, and generally did not even talk with the inventors—Marvell usually conducted the interview and sent Townsend a recording on tape.  (Id.)  Though Townsend attempted to obtain patent opinion or counseling work from Marvell, the company rebuffed the firm's efforts.  (Haughey Decl. ¶ 2; Tabibi Decl. ¶ 3; Steiner Decl. ¶ 7 & Ex. 3.)  As a result, Townsend never performed any patent infringement analyses for Marvell relating to any patents—the type of more complex work that would have expanded the communications between the company and the firm.  (Haughey Decl. ¶ 3; Tabibi Decl. ¶ 2.)

Marvell vastly overstates the significance of the details of Marvell technology in this case.  The critical issue here is whether the end products practice the 802.11a/g/n standard and thus infringe the '069 patent; any additional features of Marvell's technology are simply irrelevant to the litigation.  (Furniss Decl. ¶¶ 7-9.)  Compliance with the standard is conclusively

---

[12]   Moreover, none of Townsend's patent prosecution attorneys who worked on Marvell's matters ever discussed those matters with Townsend's lawyers who worked on the CSIRO litigation.  (Houghey Dec. ¶ 6; Tabibi Decl. ¶ 5; Colwell Decl. ¶ 10; Furniss Decl. ¶ 6.)  As a practical matter, there has never been any danger that Marvell information learned by Townsend through its work for the company would be used in the CSIRO litigation.

[13]   The Janofsky Declaration (at ¶¶ 20 and 21) also references trademark work and domain name registrations performed by Townsend for Marvell.  Presumably, the information was included simply to bolster the impression that Townsend performed a high volume of work for Marvell, as neither the declaration nor briefs explain how any information conveyed in relation to that work bears any significance to the '069 patent infringement actions.  It is difficult to imagine how trademark or domain name work could *possibly* involve any such relevant information.  The *name* of a product or a website has nothing to do with the technical specifications and functions of the product.

demonstrated by the RTL code, which the Court has already ordered the parties to obtain from their component chip makers. (Id. ¶ 7.) That information—even if confidential—plainly would be discoverable no matter who represented CSIRO. (Id.)

### C.   DISQUALIFICATION WOULD BE EXTREMELY PREJUDICIAL TO CSIRO

CSIRO would be extremely prejudiced by the disqualification of Townsend, the law firm in which CSIRO has invested more than five years, thousands of hours and millions of dollars in fees. (Colwell Decl. ¶¶ 11-14; Furniss Decl. ¶¶ 2-3; Steele Decl. ¶¶ 8-11.)[14] Even assuming CSIRO could find sufficiently experienced patent counsel with the depth and expertise to represent it here, disqualifying Townsend would deprive CSIRO of the particular expertise the firm has developed over the course of its extensive work on the '069 enforcement matters. (Id.) Townsend has worked closely with CSIRO since 2002, developing CISRO's licensing strategy, attempting to negotiate a license with manufacturers, investigating background facts, preparing and implementing a litigation strategy, and taking '069 cases through discovery, Markman proceedings and summary judgment. (Id.) The experience and expertise Townsend has developed in those thousands of hours of work are unique and irreplaceable. New counsel would not only lack Townsend's experience with this case, they would presumably be barred from relying on Townsend attorneys' knowledge.

Bringing new counsel into the '069 cases would also delay the litigation tremendously. CSIRO estimates that bringing a new law firm up to speed would require at least six months of background work before the new attorneys could be prepared to prosecute the cases. (Steele Decl. ¶ 9; Furniss Decl. ¶ 3.) The effort of doing so would be enormous, and would of course impose huge costs on CSIRO. (Id.) It is virtually certain that disqualification would make it

---

[14]   Marvell claims that Townsend said it would not represent CSIRO in the Marvell action, which is not true. While Townsend's Daniel Furniss told Marvell's counsel that the firm would not be appearing in the Marvell case *now*, CSIRO of course reserves the right to be represented by Townsend in that case, as it has in all of the other '069 cases, once initial procedural matters have been handled by Kerr & Wagstaffe (which is not an intellectual property firm). Because the Marvell case should be dismissed, or at least stayed, the matter may become moot.

impossible for the parties to meet the Court's fall 2007 deadline for mediation.  (Steele Decl. ¶ 10.)

## III.   MARVELL'S MOTION TO STAY SHOULD BE DENIED

Marvell seeks a "partial stay" of CSIRO claims against Marvell's customers who are parties in the Toshiba and Microsoft action.  Though CSIRO's claims against these customers significantly preceded Marvell's declaratory relief action, Marvell contends that staying part of the first-filed actions would be more "judicially efficient."  To the contrary, its awkward request would actually eliminate no party from this case, but force them to litigate the same claims in piecemeal fashion.  Moreover, a stay would only defer, not eliminate, the dispute over Townsend's alleged conflict.

### A.   THE CUSTOMER SUIT DOCTRINE IS INAPPLICABLE

#### 1.   The customer plaintiffs are not mere resellers of Marvell products

Generally, when there is more than one action involving the same patent, the "first to file rule" gives priority to the first lawsuit while the second action is stayed.  Aventis Pharma Deutschland GMBH v. Lupin Ltd., 403 F. Supp. 2d 484, 489 (E.D. Va. 2005) (citing Schwartz, Herbert, Patent Law and Practice, § 3.V.A. (4th. Ed. 2003)).  Marvell seeks to defeat that rule by invoking a limited and discretionary exception with absolutely no applicability here.  Pursuant to the "customer suit exception," a court may in narrow circumstances elect to stay an infringement action "where the first action is brought against the customer of an offending manufacturer and a subsequent action is brought involving the manufacturer itself."  Whelen Techs., Inc. v. Mill Specialties, Inc., 741 F. Supp. 715 (N.D. Ill.1990); Katz v. Lear Siegler, Inc., 909 F.2d 1459, 1464 (Fed. Cir. 1990).  The judicially-created customer suit exception was designed to address the concern—entirely absent in this case—that a patent holder could unfairly secure a forum of its choice by suing customers of the manufacturer of the infringing product in a forum where the manufacturer could not be sued.  Codex Corp. v. Milgo Elec. Corp., 553 F.2d 735, 738 (1st Cir. 1977); BBC Intern. Ltd. v. Lumino Designs, Inc., 441 F. Supp. 2d at 442-43.  The exception is

14

premised on the view that a manufacturer is, in fact, the real party in interest and has a "greater interest in defending its actions against charges of patent infringement." Kahn v. General Motors Corp., 889 F.2d 1078, 1081 (Fed. Cir. 1989).  A manufacturer seeking to apply the exception must file a declaratory relief action promptly after the commencement of the suit against the customer, and must do so in the manufacturer's home forum. BBC Intern., 441 F. Supp. at 443-44.

The exception has *no* application here, where the alleged "customers" are more than mere resellers of the manufacturer's products, but the directly infringing parties themselves.  There is no authority for staying a first-filed infringement suit simply because the manufacturer of a component of the end product at issue has filed its own declaratory judgment action. Kahn, 889 F.2d 1078.  In Kahn, the Federal Circuit rejected a component maker's attempt to stay the patent holder's first-filed suit against the manufacturers of the directly infringing end product. Id. at 1081.  The court based its ruling on the recognition that in such situations, efficiency was not served because the second action would not resolve all claims in the first. Id.  In Air Products and Chemicals, Inc. v. MG Nitrogen Servs., Inc., 133 F. Supp. 2d 354 (D. Del. 2001) the court rejected arguments identical to those raised by Marvell here, refusing to stay a first-filed suit against an infringing end product manufacturer in favor of a latter-filed suit by a component maker. Id. at 357.

Kahn and Air Products are directly analogous to the instant case.  Marvell is a *component part* maker that erroneously alleges its right to interrupt a pending first-filed suit against the manufacturers of the directly infringing product.  As in those cases, the plaintiffs here are not "mere resellers" of Marvell products, but themselves the manufacturers of the products that directly infringe Marvell's patent.  The customer suit exception simply does not apply.

The cases cited by Marvell are inapposite. Katz v. Lear Siegler, Inc., 909 F.2d 1459 (Fed. Cir. 1990), involved a true customer suit against gun dealers who sold allegedly infringing Smith & Wesson guns.  There, the plaintiff explicitly acknowledged that defendants were only dealers of the infringing goods. Id. at 1464.  In Ciena Corp. v. Nortel Networks, Inc., 2005 WL

1189881 (E.D. Tex. 2005), Nortel sought to enjoin Ciena's effort to enforce its patent claims before the International Trade Commission ("ITC").  After finding that a forum selection agreement between Nortel and Ciena required that the action be brought in the Eastern District of Texas, this Court *analogized* to the customer-suit exception and found the circumstances warranted enjoining the ITC action against a second defendant, Flextronics.  Id. at *3–8, 9. However, the Court explicitly found that because Flextronics' role was limited to manufacturing the device according to Nortel's mandated design, its liability was "entirely predicated on Nortel's infringement," making it "merely a secondary party" to any infringement issues.  Id. at *9.  In contrast here, the end product makers here dictate specifications to Marvell.  The case suggests the Marvell is the secondary party and that *Marvell's* separate action should be stayed.

### 2.   Marvell's declaratory relief action will not resolve all claims against the Marvell customer plaintiffs

A stay would do nothing to promote efficiency, but rather disrupt the litigation and increase the burden on the Court and CSIRO.  The party invoking the customer suit exception bears the burden of establishing that it would be "demonstrably more efficient" to proceed first with the patent infringement suit involving the manufacturer, as opposed to its customers.  Tegic Communications Corp. v. Board of Regents of the University of Texas System, 458 F.3d 1335, 1343 (Fed. Cir. 2006).  An essential element of demonstrating such efficiency is that "the second action would resolve all charges against the customers in the stayed suit, including liability for damages."  Kahn, 889 F.2d at 1081; Katz v. Siegler, 909 F.2d 1459, 1463 (Fed. Cir. 1990) ("[The] primary question is whether the issues and parties are such that the disposition of one case would be dispositive of the other.").

The Marvell declaratory relief action will *not* completely resolve CSIRO's patent infringement claims against Marvell's customers who are plaintiffs here, for several reasons. First, no Marvell customer has agreed to be bound by any decision in the Marvell declaratory relief lawsuit.  See Kahn, 889 F.2d at 1082 ("even if General Motors were a mere customer of Motorola, General Motors has not agreed to be bound by the Illinois decision or any injunction

against Motorola"). No customer has even joined in Marvell's motions. Second, Marvell has not claimed that it is the *exclusive* chip supplier to anyone, so Marvell's customers will remain in the <u>Toshiba</u> and <u>Microsoft</u> cases even if the separate Marvell suit proceeds. <u>See</u> <u>Kahn</u>, 889 F.2d at 1083; <u>Tillotson Corp. v. Shijiazhuang Hongray Plastic Products, Ltd.</u>, 2007 WL 1247121 at *3 (N.D. Ga. April 30, 2007).

At best, resolving the Marvell declaratory relief action could resolve *some* but not all of the patent infringement claims alleged against its customers here. <u>A.P.T. Inc. v. Quad Enviromential Technologies, Corp.</u>, 698 F. Supp. 718, 722 (N.D. Ill. 1988) ("[W]here the patentee has a separate interest in litigating against the customer, the 'real party in interest' rationale for giving priority to the manufacturer's lawsuit is inapplicable. In these situations courts do not apply the customer suit exception."). Granting the stay would therefore fragment the litigation and cause unnecessary delay.

### 3.    Marvell otherwise fails to satisfy the basic requirements for application of the customer suit exception

Marvell's invocation of the customer suit exception fails for several additional reasons. First, Marvell failed to file its declaratory relief action "promptly" after CSIRO brought its infringement claims against Marvell customers in the <u>Microsoft</u> and <u>Toshiba</u> cases. <u>BBC Intern.</u>, 441 F. Supp. 2d at 443-44. The <u>Microsoft</u> case is over two years old, and Marvell has long known of its customer relationship and purported "indemnity obligation" to a party in that case. (Calladine Decl. ¶¶ 5, 7 & Ex. 2.) Even if Marvell claims its interest did not arise until CSIRO filed its cross-claim, Marvell delayed filing its declaratory action complaint for over *eight months*, until May 4, 2007, then delayed an *additional two months* before bringing this motion. Such inexplicable delay alone justifies denial of Marvell's motion for stay. <u>Dentsply Int'l, Inc. v. Kerr Mfg. Co.</u>, 734 F. Supp. 656, 659 (D. Del. 1990) (finding five month delay in filing declaratory relief action justified denying motion to stay predicated on the customer suit exception). Furthermore, the exception is intended to preclude improper forum shopping, but CSIRO properly filed in this Court (other '069 cases have been transferred here) and Marvell

brought its declaratory judgment action here as well.  Marvell simply cannot meet the

requirement of demonstrating that it could not have been sued in Texas.  BBC Intern., 441 F.

Supp. 2d at 443-44.

### B.     MARVELL'S PURPORTED HARDSHIP CONCERNS ARE ILLUSORY

Marvell also contends that a partial stay will allow its customers to avoid "unnecessary

hardship," and that it would be "unfair" to require them to defend against claims arising from

parts they did not design or manufacture.  (Mot. at 12.)  But as Marvell itself concedes, it is

Marvell—not its customers—who is complaining.  Marvell has no standing to assert the alleged

hardship to third parties who have not even joined in its motion.  The only "hardship" those

plaintiffs face is the obligation to account for their own infringing end products.  They cannot

claim, and none has ever tried to claim, to have been "unfairly" hauled into court to defend

Marvell's wrongdoing.  Marvell also asserts that "if the stay is not granted, Marvell must risk

having its customers' products permanently enjoined without the opportunity to defend against

CSIRO's claims" (Mot. at 13), but that too is its customers' interest, not its own.  If Marvell

really wanted to challenge CSIRO here, it would seek to intervene for all purposes and litigate

alongside its customers.

Marvell points to only one hardship to itself: the request by its customers for "assistance"

in this case.  (Mot. at 13.)  That "assistance," however, is nothing more than compliance with

Marvell's discovery obligations.  There is simply no rule that Marvell should be allowed to stay

an action to avoid producing third party discovery.

### C.     A "PARTIAL" STAY WILL BE UNDULY PREJUDICIAL TO CSIRO

In contrast, a stay would result in severe and undue prejudice to CSIRO.  As shown

above, a stay would splinter the '069 litigation, needlessly dragging out resolution and

purposelessly burdening the Court.   Also, a stay would only delay the disqualification issue.  If

CSIRO decides to use Townsend to defend the Marvell action, then Marvell will presumably

raise the disqualification issue in that case.  If CSIRO seeks to avoid the issue, it will be forced to

retain new counsel and incur the prejudice, expense and delay of doing so.

For all of the reasons set forth above, Marvell's request for a stay should be denied.

## IV.    MARVELL'S ALTERNATIVE REQUEST TO DISQUALIFY TOWNSEND SHOULD BE DENIED

### A.    THE PARTY SEEKING DISQUALIFICATION BEARS A HEAVY EVIDENTIARY BURDEN

Motions to disqualify are governed by federal law.  In re Snyder, 472 U.S. 634, 645 n.6

(1985); In re Dresser Indus., Inc., 972 F.2d 540, 543 (5th Cir. 1992) (court must "consider the

motion governed by the ethical rules announced by the national profession in the light of the

public interest and the litigant's rights.").[15]  The Fifth Circuit directs that district courts look to

state rules for guidance.  Crowe v. Smith, 151 F.3d 217, 232 (5th Cir. 1998); In re American

Airlines, 972 F.2d 605, 611 (5th Cir. 1992).  This Court may not, however, restrict its analysis to

Texas ethical rules, but must also take into account other sources, like the American Bar

Association ("ABA") Model Rules of Professional Conduct ("Model Rules") or the ABA Model

Code of Professional Responsibility ("Model Code"), "as the national standards utilized by this

circuit in ruling on disqualification motions."  American Airlines, 972 F.2d at 610.

Recognizing the potential for abuse, the right of parties to choose their own counsel and

the huge prejudice that may result from disqualification, courts are universally reluctant to take

that extreme measure.  "Disqualification is a severe remedy … [t]he courts must adhere to an

exacting standard when considering motions to disqualify so as to discourage their use as a

dilatory trial tactic."  Abney v. Wal-Mart, 984 F. Supp. 526, 528 (E.D. Tex. 1997), quoting

Spears v. Fourth Court of Appeals, 797 S.W.2d 654, 656 (Tex. 1990).  As the Fifth Circuit has

stated:

> A disqualification inquiry, particularly when instigated by an
> opponent, presents a palpable risk of unfairly denying a party the
> counsel of his choosing.  Therefore, notwithstanding the
> fundamental importance of safeguarding popular confidence in the
> integrity of the legal system, attorney disqualification, particularly

---

[15]    The Federal Circuit has held that attorney disqualification matters are governed by the particular regional circuit court where appeals from the district court would normally lie.  In re Pioneer Hi-Bred Int'l, Inc., 238 F.3d 1370, 1374 (Fed. Cir. 2001).

> the disqualification of an entire firm, is a sanction that must not be imposed cavalierly.

F.D.I.C. v. U.S. Fire Ins. Co., 50 F.3d 1304, 1316 (5th Cir. 1995). The Fifth Circuit mandates a

pragmatic approach, stating that "[t]he rule of disqualification is not mechanically applied in this

Circuit." Church of Scientology of California v. McLean, 615 F.2d 691, 693 (5th Cir. 1980)

(citation omitted). The "inflexible application of a professional rule is inappropriate because

frequently it would abrogate important societal rights, such as the right of a party to his counsel

of choice and an attorney's right to freely practice her profession." F.D.I.C., 50 F.3d at 1314.

"All of the facts particular to a case must be considered, in the context of the relevant ethical

criteria and with meticulous deference to the litigant's rights." Id.

As the party seeking disqualification, Marvell bears the burden of proving that

disqualification is warranted. Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 646 F.2d

1020, 1028 (5th Cir. 1981), cert. denied, 454 U.S. 895 (1981). The movant bears a "heavy

burden" and must proffer "specific evidence" of a conflict. Hollenbeck v. Boivert, 330 F. Supp.

2d 324, 336 (S.D.N.Y. 2004). "This high standard required of the party seeking disqualification

is necessary because disqualification motions are often interposed for tactical reasons, and ...

even when made in the best of faith ... inevitably cause delay." Id. (internal citations and

quotations omitted); Felix v. Balkin, 49 F. Supp. 2d 260, 267 (S.D.N.Y. 1999) ("Motions to

disqualify are generally not favored. They are often tactically motivated; they cause delay and

add expense; they disrupt attorney-client relationships sometimes of long standing; in short they

tend to derail the efficient progress of litigation."). Thus, parties moving for disqualification

carry a "heavy burden" and must satisfy a "high standard" of proof. Hollenbeck, 330 F. Supp.

2d at 336.

### B.    THE RULES GOVERNING CONCURRENT CLIENTS ARE INAPT

Marvell erroneously claims to be a current client of Townsend, but any attorney-client

relationship between Townsend and Marvell ended when Marvell sued Townsend then sought an

order from a California state court enjoining the firm from representing CSIRO here. The point

is of no consequence: even if CSIRO and Marvell are treated as Townsend's concurrent clients, they were never directly adverse, at least until Marvell chose to sue CSIRO in May of this year (well after any concurrent representation ended).  Townsend should also not be disqualified because any "conflict" that exists was thrust upon the firm by Marvell's own conduct.[16]

### 1.   Townsend's representation of CSIRO is not directly adverse to Marvell

For a conflict to exist between two concurrent clients, they must have more than adverse *interests*—they must be actually and directly adverse.  An indirect economic interest in the outcome of a case, even if based on an indemnity agreement, does not create direct adversity giving rise to a disqualifying conflict.

Marvell says Townsend's representation of CSIRO in the <u>Microsoft</u> and <u>Toshiba</u> actions is adverse to Marvell because the injunctive relief sought by CSIRO allegedly would bar it from selling parts to customers involved in these cases.  (Mot. at 18-19.)  That is not correct, as CSIRO does not seek to enjoin Marvell, but rather seeks to enjoin the infringing products at issue in, less than one percent of which happen to contain Marvell components.  At most, Marvell's "interest" here is limited to a very slight diminution in the market for its component parts.[17]  That

---

[16]     Marvell asserts that to this day its remains a Townsend client "in at least one matter." (Mot. at 18.)  This assertion is groundless.  As effectively conceded by Mr. Janofsky in his declaration, Townsend has ended its relationship with Marvell, and does not currently represent any Marvell entity.  Townsend does represent another client in conjunction with that matter, and acting solely on that client's behalf, has petitioned the PTO to remove several pages of Marvell documents that were inadvertently copied and included in the other client's confidential patent application.  (Tabibi Decl. ¶¶ 8-14; Slone Decl. ¶¶ 2-8; Declaration of Richard T. Ogawa ("Ogawa Decl.") ¶¶ 2-8.)  Townsend does not currently represent, and has never represented, Marvell in those efforts, and has had no communication with Marvell regarding the same since Marvell sued Townsend.  (<u>Id</u>.)  Indeed, the only "evidence" offered to support this claim is a January 2007 e-mail, which predates the end of the Townsend-Marvell relationship.  Townsend has not billed Marvell, and has even declined to identify the client whose patent application is involved.  (<u>Id</u>.)  Further, Marvell's counsel of record in the California state court action has indicated on Marvell's behalf that it intends to sue Townsend for its conduct concerning this inadvertent disclosure.  (Calladine Decl. ¶ 4.)

[17]     Of course, the customer may agree on a license with CSIRO, in which case Marvell would face no negative effect whatsoever.

"interest" does equate to direct adversity.

In support of its argument, Marvell relies on ABA Model Rule 1.7, which provides, in relevant part, that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: [¶] (1) the representation of one client will be *directly adverse* to another client[.]" ABA Model Rule 1.7(a) (emphasis added). However, pursuant to that rule, mere *economic adversity* resulting from a potential loss of revenue is insufficient to establish that Townsend's representation of CSIRO is *directly adverse* to Marvell.

The comments to Model Rule 1.7(a) make this absolutely clear. Comment 6 explicitly states: "[S]imultaneous representation in unrelated matters of clients whose interests are only *economically adverse*, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients." See, e.g., Shire Labs. Inc. v. Nostrum Pharmaceuticals, Inc., 2006 WL 2129482 at *5 (D.N.J. 2006) (citing Model Rule 1.7, comment 6, as support for concluding that a law firm's representation of pharmaceutical client which sought to launch a competing, generic version of a drug that would undermine another client's financial interests did not warrant disqualification).

Similarly, the American Bar Association ("ABA"), in its Formal Opinion 95-390, recognized that there is no direct adversity where the client merely suffers economic repercussions as the result of the firm's pursuit of claims against a party related to that client. There, the ABA found that an attorneys' representation of a parent corporation is not "directly adverse" to representation of a second client that has filed suit against the first client's subsidiary. Acknowledging that the liabilities of the subsidiary directly impact the parent, and that therefore the action against the subsidiary could negatively affect the client parent, the ABA nevertheless concluded that, "the adverseness is, for purposes of Rule 1.7, indirect rather than direct, since its immediate impact is on the affiliate, and only derivatively upon the client." (Id. at 11.) Numerous courts have reached the same conclusion and held that separate entities are

22

treated separately for conflicts purposes, notwithstanding close economic ties between the client

and the non-client adverse party.  See, e.g., Gilbert v. Knoxville Int. Energy Exposition, 547 F.

Supp. 53, 54 (E.D. Tenn. 1982); AMBAC Indemnity Corp. v. Bankers Trust Co., 546 N.Y.S. 2d

265, 272-73 (1989).

Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court, 60 Cal. App. 4th

248, 256 (1997), in which the appellate court considered whether a firm's representation of a

wholly owned subsidiary precluded the firm from defending a lawsuit filed by the parent

corporation, is instructive.  Id. at 256-57.  The court acknowledged that *all* of the subsidiary's

liabilities directly impacted the parent corporations' bottom line but nevertheless ruled: "The

answer to this argument is that only direct adverse consequences to an existing client are barred

… . [A]ny negative economic consequences a corporation may suffer as a result of litigation

against its affiliate is indirect rather than direct, 'since its immediate impact is on the affiliate,

and only derivatively upon the client.'"  Id. at 256 (citations omitted).

The court cited two policy justifications for not extending the scope of conflict rules to

clients with indirect stakes in an outcome.  First, doing so would make it impossible to construct

a meaningful standard to distinguish what indirect impact to non-party clients would qualify for

protection.  Id.  Second, as is the case here, conflict screening would be impossible, because no

firm could readily track undisclosed, private interests of clients in an adverse party.  "Not only

would this impose undue constraints on the attorney-client relationship, but it could also prove

impossible in practice to implement."  Id. at 257.

Here, Marvell does not allege that Townsend's representation of CSIRO will *directly*

cause any harm to Marvell.  Rather, all of the parade of economic horribles forecast by Marvell

are based on CSIRO's enforcement of its patent rights against Marvell's customers—*not*

*Marvell.* (Mot. at 20.)  Whether those financial interests are implicated by a (very slightly)

diminished market for Marvell components due to an injunction on infringing end products using

23

Marvell components,[18] or by "indemnification demands from its customers" (Mot. at 18–19),

Marvell's interest remains purely economic, contingent and thus indirect—an insufficient

interest to create direct adversity to Townsend's representation of CSIRO.[19]

The infirmity of Marvell's position is underscored by its misplaced reliance on a

distinguishable district court decision. Rembrandt Technologies, LP v. Comcast Corp., 2007

WL 470631 (E.D. Tex. Feb. 8, 2007). In that case, the Fish & Richardson ("F & R") law firm

represented plaintiff Rembrandt in various cases seeking to enforce its patents related to the

ATSC digital television standard and DOCSIS standard for data transmission over cable

networks. Id. at *1. At the same time, the firm solicited and obtained litigation defense work

from Time Warner Inc., and represented that company in Digital Packet Licensing, Inc. v. Time

Warner Cable, a case also before this Court involving Digital Packet's patent for a "Multiplexed

Digital Packet Information System." Id. F & R never disclosed to Time Warner that the firm

also represented Rembrandt, though it was apparently aware that Time Warner was soon to be

sued by Rembrandt for infringement of the ATSC and DOCSIS patents. Id. The overlap of

relevant information between the Rembrandt and Digital Packet cases was substantial—

confidential information F & R obtained from Time Warner was clearly of the type highly useful

to Rembrandt in the ensuing suit. Id. Though the actual suit against Time Warner was handled

by a separate firm, the Court found that the prejudice to Time Warner was sufficient to warrant

disqualification of the firm. Id. at * 1–3.

Though the case bears some superficial similarities to this one, Rembrandt provides little

---

[18]    Marvell manufactures components used in only 66 of the 6,800-plus infringing end products at issue here, or less than one percent of the total.  (Furniss Decl. ¶ 4.)

[19]    Taking the pragmatic view, Marvell's theory of adversity would make it virtually impossible for the victim of widespread infringement to secure competent counsel with the sufficient legal and technical experience to enforce its patent rights.  Marvell's argument could be raised in opposition to representation of CSIRO by any attorney who represents any maker of any component of any 802.11 compliant device—given the identity of the parties, a client group that encompasses most of the technology industry and thus an attorney group encompassing most of the high tech patent bar.  That untenable result is obviously to be avoided.

guidance for the Court here, for a number of reasons.  First, <u>Rembrandt</u> was very clearly based on the failure of the F & R law firm to disclose its representation of Rembrandt to Time Warner, explicitly stating, "Much of the prejudice might have been avoided had F & R disclosed this case when it solicited Time Warner's business in the Digital Packet litigation.  Had that occurred, Time Warner could have secured other counsel and might not have been a current client of F & R during the pendency of this case."  <u>Id.</u> at *4.  Here, Marvell was perfectly aware that Townsend was representing CSIRO in the '069 matters, even before Marvell began sending patent application work to the firm.  Marvell's outside counsel, after all, contacted Townsend in June 2005 to inquire about a license from CSIRO.  Marvell does not and cannot allege that it was unaware of Townsend's role in these cases.

Second, Rembrandt affirmatively sued Time Warner, based on claims apparently identical to those asserted in the <u>Rembrandt</u> case itself.  In contrast here, CSIRO has never sued Marvell, and repeatedly and consistently told Marvell that CSIRO had no intention of suing it. (Colwell Decl. ¶¶ 6, 9.)  Instead, Marvell has sued CSIRO, and now seeks to insert itself into this and the <u>Microsoft</u> case.  Marvell's involvement in this litigation is entirely of its own making.

Third, while Time Warner and Comcast (the defendants in the <u>Rembrandt</u> case) occupied identical positions with respect to the legal and factual arguments asserted by Rembrandt, there is no equivalent identity of the defendants in this case and Marvell.  In <u>Rembrandt</u>, the Court identified the particular prejudice to Time Warner as the danger that a finding against Comcast would have bearing on "all major cable companies who follow the industry standard."  <u>Id.</u> at *4. The plaintiffs here are the manufacturers of *end products* that infringe on CSIRO's patent; Marvell is a maker of a *component* of those end products.  A finding that the end products infringe does not answer the question of whether any component infringes.  The analogy to <u>Rembrandt</u> is therefore misplaced.

### 2. Marvell's indemnity agreements with customers are insufficient to show direct adversity

Equally without merit is Marvell's ancillary contention that direct adversity exists by

virtue of Marvell's indemnity agreement with one of the plaintiffs.  As support for this novel proposition, Marvell relies on Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp., 2006 WL 1877078 (N.D. Ga. July 5, 2006) (slip op.).  In Snapping Shoals, the Paul Hastings law firm concurrently represented the plaintiff as well as L-3 Titan, the former owner of defendant Cayenta and the express indemnitor of all of Cayenta's liabilities under the specific contract at issue in the case.  While the court acknowledged the rule that no conflict would arise as a result of indemnity obligations alone, it found *additional* facts giving rise to a conflict of interest in that particular case.  Specifically, Paul Hastings' client, L-3 Titan, expressly agreed to indemnify Cayenta or its new parent corporation based on harm arising from the particular software contract under which plaintiff sued.  Further, L-3 Titan and Cayenta shared management personnel, employees, corporate policies and headquarters at the time Paul Hastings represented L-3 Titan, "such an indistinguishable corporate structure that they were recognized and operated as one." Id. at *5.  Finally, Paul Hastings was aware of the indemnity agreement and a fund set aside for potential indemnity payments due, in part, to work it performed while representing L-3 Titan. Id. at *3.

In contrast here, the dispute arises out of the plaintiffs' infringement of CSIRO's patent, not a contract for which Marvell has expressly provided indemnity.  Marvell has pointedly refused to acknowledge that it has agreed to indemnify any plaintiff, and has produced no evidence (other than its own evasive words "acknowledged this claim for indemnification") that it has in fact incurred any obligation.  Marvell even refuses to identify the purported indemnitee.  Nevertheless, it is clear that the relationship between Marvell and its purported indemnitee comes nowhere near the "indistinguishable corporate structure" that created the perception that L-3 Titan and Cayenta were in fact the same company.  Marvell does not allege any facts that suggest the existence of anything but the arm's length relationship of supplier and wholesale purchaser between it and the plaintiff in this action.  Finally, in contrast to Paul Hastings in Snapping Shoals, Townsend had absolutely no idea of the existence of the indemnity agreement between Marvell and its purported indemnitee until March 13 of this year, at which time

26

Townsend ended its representation of Marvell.  Quite the contrary, Marvell's prior actions indicated an absence of any conflict.  Unless Marvell intended to manufacture the conflict, its conduct can only mean that Marvell never believed itself adverse to CSIRO.

Marvell's economic interest in the outcome of this case, either as a result of the possible impact on its customer or Marvell's purported indemnity obligation, simply does not make it adverse to Townsend's representation of CSIRO.  Thus, whether or not Marvell is treated as a concurrent client, there is no basis to disqualify Townsend from representing CSIRO here.

### 3.        Any conflict is of Marvell's own making

Even if CSIRO and Marvell somehow could be considered "directly adverse," disqualification is not appropriate where, as here, the purported conflict arises between existing clients through no fault of counsel.  Federal law recognizes that in circumstances in which a conflict is either "thrust upon" a firm or manufactured by an opponent for tactical purposes, the firm may withdraw from representation of one of the parties, thus avoiding both the conflict and the severe prejudice and disruption that would result from disqualification.  In such situations, a firm may withdraw from representing one of the adverse parties and thereafter treat that party as a former client.

The ABA Model Rules expressly recognize the exception:

> Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. *Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict.*

ABA Model Rule 1.7, comment 5 (emphasis added).  In <u>Board of Regents of the University of Nebraska v. BASF Corp.</u>, 2006 WL 2385363 (D. Neb. 2006), the court relied on the ABA commentary in refusing to disqualify defense counsel for its concurrent representation of an adverse party.  In that case, Kirkland & Ellis ("K & E") represented defendant BASF in a case concerning intellectual property rights the plaintiff alleged it acquired under contract from the

BASF's predecessor.  Id. at *1–2.  Subsequent to the initiation of the suit, the plaintiff and

Monsanto Company entered an agreement concerning the same technology at issue in the case,

though plaintiff did not disclose the agreement to BASF.  Id. at *3.  After BASF discovered the

agreement, Monsanto moved to intervene, then sought to disqualify K & E on the basis of that

firm's preexisting representation of Monsanto in another case.  Id. at *4.  Making factual

arguments virtually identical to Marvell's here, Monsanto claimed that it paid K & E "millions of

dollars in legal fees," that the firm had reviewed "millions of pages of Monsanto's confidential

records" on biotechnology issues similar to that at issue in the BASF case, was privy to

"Monsanto's biotechnology business strategy," and "worked very closely with numerous top

level executives, scientists, and lawyers at Monsanto in . . . discussing . . . Monsanto's

biotechnology and acquisition strategies."  Id. at *1.

      Acknowledging the concurrent representation and direct adversity, the court nevertheless

reasoned that in disqualification matters, "discretion must be carefully exercised, as such motions

can be asserted for a variety of tactical reasons, and the disqualification of counsel deprives the

client of counsel of its choice."  Id. at *4.  Reviewing federal law and the ABA Model Rules, the

court found that disqualification was improper because the conflict had been "thrust" upon the

firm.  Id. at *10.  Because the conflict was unforeseen and not of the firm's own making, it

allowed K & E to remain as counsel for BASF.  Id. at *11.[20]

      The rule against disqualification in such circumstances is well-recognized and widely

followed.[21]  Of course, a disqualification motion also should be rejected where, as here, the

---

[20]     The court also found that Monsanto failed to show that the prior and current
representations were substantially related or that relevant confidential information was divulged,
rejecting Monsanto's conclusory claims that K & E had worked very closely with "top level
executives, scientists, and lawyers at Monsanto in . . . discussing . . . Monsanto's biotechnology
and acquisitions strategy," and holding that the statements by themselves were inadequate basis
for disqualification.  Id. at *8.  The court stated that it could not "simply accept [Monsanto's]
conclusions without evidence."  Id.

[21]     See, e.g., Gould, Inc. v. Mitsui Mining & Smelting Co., 738 F. Supp. 1121 (N.D. Ohio
1990) (disqualification not warranted by "thrust-upon" conflict where disqualification would

moving party has manufactured a conflict for tactical advantage.  Such a situation arose in <u>Klein</u>
<u>v. Churchill Coal Corp.</u>, 612 F. Supp. 247 (S.D.N.Y. 1985), where the defendant attempted to
disqualify his former counsel from representing plaintiffs.  Though the court found there was a
substantial relationship between that case and an earlier case in which the attorney represented
the defendant, which "[o]rdinarily… would end the inquiry" it did not grant the disqualification
because defendant, "aware of a possible conflict of interest between himself and the present
plaintiffs, deliberately concealed from [the attorney] facts giving rise to that conflict for the
precise purpose of inducing him to undertake a representation he would otherwise decline." <u>Id.</u>
at 250.  The court emphasized, "We think it obvious that a person may not immunize himself
from suit by a lawyer by fraudulently maneuvering the lawyer into a position where he might be
said to have a conflict of interest." <u>Id.</u> at 251.

     To the extent a conflict exists here, it was entirely of Marvell's own making.  Townsend
played absolutely no role in creating the conflict Marvell now alleges, and could not have
foreseen what Marvell now alleges creates a "conflict," for a number of reasons.  First, CSIRO
has never sued Marvell, and consistently and repeatedly told Marvell that it had no intention of
ever enforcing its '069 patent against component manufacturers like Marvell.  (Colwell Decl. ¶¶
6, 9.)  Second, though Marvell has long known all the facts it now says give rise to a conflict, it

---

cause delay and deprive plaintiff of counsel well-versed in the complex technological issues in
the case); <u>Carlyle Towers Condominium Association, Inc. v. Crosslands Savings, FSB</u>, 944 F.
Supp. 341 (D.N.J. 1996) (concurrent conflict of interest that arose when defendant merged with
parent corporation of subsidiary that law firm had represented in transactional work did not
mandate disqualification); <u>Gen-Cor, LLC v. Buckeye Corrugated, Inc.</u>, 111 F. Supp .2d 1049
(S.D. Ind. 2000) (disqualification not appropriate remedy where firm represents subsidiary of
parent corporation on narrower issues and plaintiff in unrelated suit against parent corporation);
<u>Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.</u>, 142 F. Supp. 2d 579 (D. Del. 2001) (law
firm represented Apple in patent infringement action and Elonex in a separate suit naming Apple
as a defendant; court found that the matters in which firm represented Elonex and Apple were
unrelated and posed no likelihood of passing confidential information); <u>Research Corp.</u>
<u>Technologies, Inc. v. Hewlett-Packard Co.</u>, 936 F. Supp. 697, 701 (D. Ariz. 1996) ("purposes
behind the ethical rules favor an approach which does not automatically require
disqualification.").

never told or even suggested to Townsend the possibility that a potential conflict might arise. (Gilliland Decl. ¶¶ 4-6; Colwell Decl. ¶ 8; Haughey Decl. ¶ 9; Tabibi Decl. ¶¶ 3, 6; Steiner Decl. ¶ 6.)  In contrast, Marvell vigilantly monitored Townsend matters and in other instances insisted that Townsend wall off its attorneys where it thought a potential conflict might arise.  (Steiner Decl. ¶¶ 9-10 & Exhs. 4-5.)  Third, even if Townsend could have guessed that Marvell would raise the baseless claim that suing a customer creates adversity with the supplier, Marvell supplies components for only a tiny fraction of the products at issue in this case.  (Furniss Decl. ¶ 4.)  Finally, to the extent Marvell claims that the conflict is created by its purported indemnity agreements, the agreements were hidden from Townsend and CSIRO until very recently, days before Marvell filed suit against Townsend.  (Calladine Decl. ¶¶ 5-9 & Exhs. 1-4.)  Townsend could not have anticipated that Marvell would have indemnified its customers against any claim of infringement, including those not based on Marvell components.  Such agreements are virtually unheard of in the technology industry.  (Colwell Decl. ¶ 8.)

Furthermore, at least one of the indemnity agreements was signed in September 2006, a year after Townsend began doing patent application work for Marvell—a paradigmatic example of a "thrust upon" conflict created by the clients' independent business decision.  (Haughey Decl. ¶ 2; Tabibi Decl. ¶ 2; Calladine Decl. Ex. 3.)  When informed—in March of this year—that Marvell believed the firm had a conflict of interest, Townsend took immediate steps to withdraw from its representation of Marvell and to prevent any sharing of information between attorneys who had worked for Marvell and CSIRO.  (Tabibi Decl. ¶ 7; Haughey Decl. ¶ 10; Steiner Decl. ¶ 3 & Ex. 2; Gilliland Decl. ¶ 7.)  Townsend, in other words, did absolutely nothing to create this conflict.

For those reasons, and because the "thrust upon" rule grants courts the authority to avoid such unintended consequences that would result from mechanical application of the conflict rules, the Court should decline to grant the severe remedy Marvell seeks.

### 4.    CSIRO will suffer considerable and undue prejudice if Townsend is disqualified

Even if there were grounds for disqualifying Townsend—which there are not—the Court should not do so because of the tremendous prejudice of disqualification on CSIRO.  See Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564, 1577 & 1581 (Fed. Cir. 1984), overturned on other grounds, Richardson–Morrell, Inc. v. Koller, 472 U.S. 424 (1985) (reversing disqualification on grounds of client's right to counsel of its choice, lack of prejudice to opposing side and other "realities of the particular situation at hand").  Even when a conflict of interest exists, the prejudice to a party may constitute grounds for denying a motion to disqualify that party's counsel.  For example, in Carbo Ceramics, Inc. v. Norton-Alcoa Proppants, 155 F.R.D. 158, 164 (N.D. Tex. 1994), the court recognized that "it is appropriate to consider the effect which disqualification would visit on [the party opposing disqualification]."  Denying the motion for disqualification, the court found compelling the fact that the defendants had spent millions of dollars defending the case, and that additional fees would be incurred if they were required to obtain new counsel.  Id.  In addition, the court noted that existing counsel were in a "far better position to plan trial strategy…."  Id.

Disqualification here would be hugely prejudicial to CSIRO.  It has invested millions of dollars and thousands of hours in developing Townsend's particularized knowledge of the facts and issues at stake here.  (Colwell Decl. ¶¶ 11-14; Furniss Decl. ¶¶ 2-3; Steele Decl. ¶¶ 8-11.)  On CSIRO's behalf, Townsend has expended considerable time and effort acquiring critical knowledge regarding wireless technology, the patent and matters relating to prior art and file histories, interviewed numerous witnesses within and outside the United States, and reviewed many thousands of documents, a high proportion of them being complex and/or technical in nature, among other tasks.  (Id.)  Townsend lawyers have an intimate understanding of CSIRO's technology, the details of claim construction, the benefit of extensive discovery, and familiarity with the Court's prior proceedings.  (Id.)  Losing that experience would greatly harm CSIRO's ability effectively to present its case, and would necessarily and significantly delay resolution of the dispute.  (Id.)  Even if there were grounds to disqualify Townsend, the Court should decline

31

to do so for the simple reason that disqualification would unfairly punish CSIRO.

Selecting and retaining replacement counsel will be an arduous and time consuming process, no doubt taking six months or more.  (Furniss Decl. ¶ 3; Steele Decl. ¶ 9.)  The enormity and complexity of the '069 patent litigation mandate that CSIRO retain a law firm with deep expertise and experience, and also sufficient size to support litigation of this large scale.  (Steele Decl. ¶ 9.)  Of course, the firm could not currently represent another party, a significant limitation given the number, size and prominence of the parties here.  (Id.)  Creating such difficulties is, of course, the real purpose behind Marvell's secret machinations and current motions.

### C.   TOWNSEND'S PRIOR WORK FOR MARVELL IS NOT SUBSTANTIALLY RELATED TO THIS LITIGATION AND NO RELEVANT CONFIDENTIAL INFORMATION WAS DISCLOSED TO TOWNSEND

Marvell is a *former* client of Townsend.  In cases such as the present involving successive representations, courts consider two distinct grounds for disqualifying an attorney based on his prior representation, either through (1) a showing that the two matters are "substantially related" such that the Court may presume that relevant confidential information was disclosed to the attorney, or (2) a showing that relevant confidential information was *actually* disclosed.  See, e.g., American Airlines, 972 F.2d at 614-15.  Under the Texas rules, however, the two are not analytically distinct:  "The moving party must prove the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary."  NCNB Texas Nat. Bank v. Coker, 765 S.W.2d 398, 400 (Tex. 1989).  There, the Texas Supreme Court reversed the disqualification of counsel because the trial court failed to show an actual threat of misuse of confidential information.  Id.; see also Metropolitan Life Ins. Co. v. Syntek Finance Corp., 881 S.W.2d 319, 320–21 (Tex. 1994).

The distinction is of no consequence here.  Marvell has not, and cannot, demonstrate that Townsend's prior representation of Marvell was substantially related to its representation of

CSIRO, and cannot point to any relevant confidential information in Townsend's possession, so its motion must be denied.

### 1.      Marvell fails to support its claim of substantial relationship with any specific facts

Whereas the rules governing concurrent representation are meant to protect both client confidences and the clients' right to undivided loyalty, the rules protecting former clients (including clients from whom the attorney has withdrawn as counsel due to an unforeseen, "thrust upon" conflict[22]) are designed to protect against the possibility that the client's confidential information will be used against it.  Marvell claims that Townsend should be disqualified under the latter rules because Townsend purportedly possesses confidential information of relevance to this case.  The argument flies in the face of logic and Marvell's own conduct.

The record shows that Marvell sent Townsend the patent application work it claims includes the relevant confidential information in *late 2006*—a *year-and-a-half* after the filing of the Microsoft case, a *year-and-a-half* after Marvell manifested its knowledge of Townsend's representation of CSIRO in the '069 matters by seeking a license through Townsend, and nearly *two years* after it signed the first of its purported indemnity agreements (which remained undisclosed to Townsend).  (Haughey Decl. ¶ 2; Tabibi Decl. ¶¶ 2-3; Colwell Decl. ¶ 6; Calladine Decl. Ex. 2.)  It is simply inconceivable that Marvell, which jealously policed its confidential information with respect to other Townsend matters (Haughey Decl. ¶ 3), allowed Townsend access to *any information* of *any relevance* whatsoever to this matter.[23]

---

[22]      "When counsel, upon discovery and absent consent, immediately withdraws from a concurrent adverse representation, the proper disqualification standard is expressed in the former representation rule."  Florida Insurance Guaranty Association, Inc. v. Carey Canada, Inc., 749 F. Supp. 255, 261 (S.D. Fla. 1990).

[23]      Even if Marvell did send relevant confidential information to Townsend, there is no risk of actual disclosure here.  None of the Townsend lawyers who worked on Marvell matters have ever communicated with any of the Townsend lawyers who work on the CSIRO litigation about the Marvell work, and Townsend has set up procedures for ensuring that no such information is disseminated.  (Colwell Decl. ¶ 10; Furniss Decl. ¶ 6; Haughey Decl. ¶ 9; Tabibi Decl. ¶ 5.)  And

It is Marvell's burden to demonstrate the conflict, and if Marvell had in fact disclosed relevant information to Townsend, it should have been easy for Marvell to identify that information.  It has not done so, and continues to refuse to produce to Kerr & Wagstaffe the documents that would elucidate the lack of any substance to Marvell's vague allegations.  The simple truth is that no such information exists—Marvell did not communicate any relevant confidential information to Townsend.  Rather than pointing to common facts or legal issues between the Marvell and CSIRO matters, Marvell simply counts up the individual matters it sent to Townsend.  Marvell's inability to point to any purportedly confidential information is, by itself, fatal to its motion.

### 2. Townsend's work for Marvell and the CSIRO litigation are not substantially related

As this Court recently recognized, to find a substantial relationship giving rise to a conflict requires careful consideration of multiple factors:

> In determining whether a substantial relationship exists, the Court must examine the issues that arose in the previous representation and the issues likely to arise in the current one. Some of the factors to be considered include (1) the factual similarities between the current and former representations, (2) the similarities between the legal questions posed, and (3) the nature and extent of the attorney's involvement with the former representation.

Biax Corp. v. Fujitsu Computer Systems Corp., 2007 WL 1466638 at *1 (E.D. Tex. May 16, 2007) (denying motion to disqualify), (quoting Power Mosfet Technologies., L.L.C. v. Siemens AG, 2002 WL 32785219 at *2 (E.D. Tex. Sept. 30, 2002)).  General allegations are insufficient—a substantial relationship may be found only if the moving party specifies with precision the overlapping factual and legal content of the two matters and present to the Court sufficient evidence to engage in a "painstaking" analysis:

> [A] substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and

---

certainly no risk of untoward disclosure exists if any such information would inevitably be disclosed in discovery to CSIRO and any counsel of its choosing.

> the court engages in a painstaking analysis of the facts and precise
> application of precedent.

American Airlines, 972 F.2d at 614 (citations omitted); see also Duncan, 646 F.2d at 1031 ("[I]n

ruling on a disqualification motion a court must look behind mere facial similarities or

dissimilarities between the prior and pending cases and focus on the precise nature of the subject

matters presented in the two representations."). "Stated otherwise, the '"substantial relationship"

test in [the] ... disqualification [context requires a] ... showing that the relationship between

issues in the prior and present cases is patently clear [or] ... when the issues involved have been

identical or essentially the same'" United States v. Aleman, 2004 WL 1834602, *2 (W.D. Tex.

Aug. 12, 2004), quoting Government of India v. Cook Industries, Inc., 569 F.2d 737, 739–40 (2d

Cir. 1978) (alterations in the original).

Marvell claims that the Townsend's former work for it and the CSIRO patent

enforcement matters are "substantially related" because some of its work handled by Townsend

involved "matters relating to Marvell's IEEE WLAN Standard 802.11 products." (Mot. at 25.)

The vaguely phrased arguments and the equally vague declaration of Marvell's in-house patent

counsel (the only evidence offered in support of this motion) fall well short of the specific

delineation required.

First, Marvell claims that Townsend worked on "matters relating to 802.11 products,

including the Marvell WLAN products that form the basis of CSIRO's claims in the current

litigation." (Mot. at 25.)  The allegation is not true and entirely unsupported.  None of the patent

applications processed by Townsend for Marvell involved any of the devices at issue in this

case.[24]  (Houghey Decl. ¶¶ 6-8; Tabibi Decl. ¶ 4.)

Second, Marvell claims that some of the patent prosecution work it sent to Townsend

"involved wireless LAN technologies" or "circuit technology, which also exposed Townsend to

Marvell's proprietary network-related devices and technology." (Mot. at 25.)  Marvell does not

---

[24]    Marvell does not explain how patent prosecution work sent to Townsend in late 2006,
and thus still wending its way through the patent application process today, involved technology
that is the subject of a lawsuit involving end products filed in December 2006.

specify the patents it refers to nor how they relate to wireless LAN technology, and has refused to produce them to CSIRO's outside counsel.  (Wagstaffe Decl. ¶¶ 2-4 & Exs. 1-3.)  Other than generic boilerplate for inclusion in the patent application, Marvell never disclosed to Townsend, nor did Townsend have any way of knowing, what the circuits would be used for.  (Id. ¶ 8; Habibi Decl. ¶ 4.)

None of the patent prosecutions involved facts of relevance in this case.  All of the end products practicing the 802.11a/g/n standard are intended, by design, to conform to the '069 patent.  (Id.)  Therefore, any *additional* features that Marvell may patent now (more than a decade after CSIRO's patent) are entirely irrelevant for this litigation.  (Id. ¶¶ 7-8.)  For Marvell to say that some of the patent applications "related to wireless LAN technology"—a phrase so general as to be meaningless—does absolutely nothing to demonstrate a substantial relationship to the factual and legal issues at stake in this litigation.[25]

This Court's recent analysis in Biax Corp. v. Fujitsu Computer Systems Corp. demonstrates the elevated standard Marvell has failed to meet.  There, Sun sought to disqualify Williams, Morgan & Amerson, P.C. ("WM&A"), which had formerly represented Sun in a patent infringement case and numerous patent prosecutions, from representing plaintiffs against Sun to enforce patents on microprocessor technology.  2007 WL 1466638 at *1–2.  Sun alleged that in the prior matter WM&A "developed a defensive and settlement strategy for infringement charges" for Sun case involving server architecture.  Id. at *2.  The Court rejected the motion,

---

[25]     Marvell also points to trademark and domain name registration work performed by Townsend.  Rather than describing the significant volume of work done by Townsend, Marvell resorts to merely counting the matters handled by the firm.  The volume of work is irrelevant, but also deceiving—a trademark registration may involve no more than the drafting of a single letter.  Marvell specifies no substantive overlap between the trademark and domain name registration work and the '069 litigation—as a logical matter, it is difficult to see how trademark and domain name work could possibly involve common factual and legal issues with the patent enforcement case at bar.  Marvell does point to a single trademark litigation involving the name of the entire company, Marvell International v. Marvell Technology, Inc.  The case was quickly settled and Townsend's work involved absolutely no substantive analysis beyond a recitation of the types of products Marvell makes.  (Steiner Decl. ¶ 4.)

finding that an affidavit from Sun's chief patent counsel was insufficient to counter WM&A's contention that the firm's effort was limited to opinion work, and further that "Sun's argument that both representations involve server architecture is too broad for purposes of establishing a substantial relationship." Id. Similarly, in this case, a single trademark litigation involving no factual issues in common with the '069 patent litigation cannot be considered substantially related to this case. Even if Townsend learned Marvell's general approach to litigation, which it did not, the information is irrelevant because CSIRO has never sued Marvell. Certainly Marvell cannot create a disqualifying conflict here by bringing its own separate suit against CSIRO.

With respect to the patent prosecutions, Sun claimed that through its prior work for the company WM&A gained access to its engineers and "an in-depth understanding of Sun's server and processor architecture." Id. WM&A acknowledged that "condition code registers were present in Sun's prior servers" but argued that "none of its prior prosecution work for Sun involved discussing the condition code registers." Id. The Court sided with WM&A, finding that "Sun has not shown that general discussions regarding the architecture of an IO chip and server discussions imputed to WM&A any detailed knowledge of code registers or parallel processing." Id. Marvell has failed to show that any technology that was the particular subject of patent applications Townsend worked on have any relevance whatsoever here.

Because Marvell has demonstrated no overlap between the factual or legal issues on any prior matter it referred to Townsend and this litigation, there is no basis for any inference that the two are substantially related, much less the "painstaking analysis" required for such a finding.

### 3.    Townsend possesses none of Marvell's relevant confidential information

Because the representations are not substantially related, Marvell must show that the attorney it seeks to disqualify actually "possesses relevant, confidential information such that there is a reasonable probability that the information could be used to the former client's disadvantage." Power Mosfet Technologies, 2002 WL 32785219 at *1. As noted, general allegations are insufficient. "Plaintiff's motion and supporting evidence must 'adequately

identify the disclosures made to [his former attorneys] ... to allow the Court to determine whether disqualification is warranted' under the confidential information theory." Abney, 984 F. Supp. at 529.  As this Court concluded in Biax, the failure of the moving party to specify both the information and its relation to the present case is fatal to its motion.  Biax, 2007 WL 1466638 at *3 ("Sun fails to meet its burden.  Sun merely argues that it disclosed confidential information related to its servers without specifically identifying what confidential information was disclosed and how, specifically, any such information is pertinent to this case.").

Astonishingly, notwithstanding its obvious awareness of exactly what information it conveyed to Townsend, Marvell inexplicably fails to specify a single concrete piece of confidential information that is relevant to CSIRO's prosecution of this case.  Marvell says only that Townsend "was necessarily made privy to" confidential information.  The generality does not suffice.  The supporting declaration from Mr. Janofsky does nothing to provide additional detail.  Despite a flurry of adjectival hyperbole ("extensive contacts," "highly proprietary," "extremely useful," "extensive knowledge," "numerous contacts," "copious amount of information," "contacts [that] were repeated, substantive, and broad," "numerous conversations" (Janofsky Decl. ¶¶ 28–31)), the declaration tellingly does not identify any of the confidential information itself.

The few concrete facts in the declaration skirt any description of relevant confidential information Marvell disclosed to Townsend.  The declaration does say that Townsend "discussed with Marvell's in-house counsel litigation strategy including Marvell's attitude toward settlement."  (Janofsky Decl. ¶ 30.)  Of course, CSIRO did not sue Marvell, so any such knowledge would be irrelevant here.  Marvell does not explain how its litigation strategy and settlement position in an entirely unrelated trademark matter, in which Marvell was the plaintiff, could possibly reveal the company's approach to litigation in which it is not even a party.  The declaration also states that Townsend learned of the identity of particular Marvell inventors through its representation of the company.  To the extent that such information is relevant, it is not confidential—if those Marvell employees possess relevant information, Marvell will be

required to identify them in its declaratory judgment action pursuant to Federal Rule of Civil Procedure 26(a)(1)(A).  The declaration also sets out a handful of direct communications between Townsend and Marvell's non-attorney personnel (though Marvell's usual procedure prohibited such contact).  What the declaration does not say is what was discussed—the substance of any purported communications is entirely absent from Marvell's supporting papers.

Finally, Marvell insists that Townsend learned the future direction of Marvell's next-generation wireless LAN products, from which it can tailor its claim construction arguments. The assertion is factually false—the CSIRO claims have already been interpreted by this Court. And even if some further interpretation becomes necessary, Townsend never learned the uses for which Marvell's circuits were intended, whether they would be used in 802.11-compliant end products, or whether they would be used at all.  (Houghey Decl. ¶ 8; Tabibi Decl. ¶ 4.)  The "direction" of future wireless LAN products is not confidential, but well known, and set out in the forthcoming 802.11n standard.  But, even if CSIRO did know the unique "direction" Marvell components were headed, it strains credulity to argue that the "direction" a single supplier of components in less than one percent of the finished products at issue in this case will affect CSIRO's claim construction strategy.[26]

The issue is more clearly viewed from the perspective of what information *is relevant* in this litigation.  To show infringement by the plaintiffs' end products, it is highly likely that the only information concerning the Marvell components needed is the chips' RTL code.  (Furniss Decl. ¶ 7.)  Marvell has always known that any other information, including the information it disclosed to Townsend, is highly unlikely to be relevant to CSIRO's '069 patent cases.

Finally, Marvell cannot show that it is "highly likely" that Townsend will seek to use the information against Marvell, because the Townsend lawyers who worked with Marvell have never discussed that work with the Townsend lawyers who work on CSIRO's cases.  (Haughey

---

[26]     CSIRO has, of course, already set out its claim construction position concerning the '069 patent in prior litigation before this Court.

Decl. ¶ 6; Tabibi Decl. ¶ 5; Colwell Decl. ¶ 10; Furniss Decl. ¶ 6; Steiner Decl. ¶ 6.)  Setting

aside any theoretical imputation of knowledge, there is absolutely no real-world danger that

CSIRO will access any of Marvell's information.  (Furniss Decl. ¶¶ 7-8.)  Because Marvell can

show neither a substantial relationship between the representations, nor the existence of any

relevant confidential information, its motion to disqualify Townsend must be denied.[27]

### D.   MARVELL HAS WAIVED ITS RIGHT TO OBJECT TO TOWNSEND'S REPRESENTATION OF CSIRO

Every single fact Marvell now claims gives rise to the alleged "conflict" here has been

known to Marvell for years—including during the *very time* it sent Townsend the patent

application work it now says contained its relevant confidential information.  (Gilliland Decl. ¶¶

4-5; Steiner Decl. ¶¶ 2-4; Haughey Decl. ¶¶ 2-6; Tabibi Decl. ¶¶ 2-4; Colwell Decl. ¶¶ 6, 9.)

Setting aside the distinct possibility that Marvell sent the work to Townsend for the express

---

[27]    CSIRO anticipates that in its reply Marvell will raise a sandbagged and misdirected issue relating to certain attorneys who recently left McGuireWoods LLP to join Townsend's Washington D.C. office. While at that firm, Jonathan Link and Richard Meyer worked on a few patent prosecution matters for Marvell that have no relation to the '069 patent litigation.  Neither Messrs. Link nor Meyer brought any Marvell work with them to Townsend, nor did they bring any hard copy or electronic records or files pertaining to Marvell.  Nevertheless, as a precautionary measure, Townsend has completely walled off these attorneys from all CSIRO matters.  Specifically, these attorneys are physically separated from the CSIRO team, none of whom work in the Washington D.C. office; they have no access to the firm's files regarding the CSIRO litigation; and Townsend has instructed its other lawyers and staff to avoid any contact or discussion with these attorneys regarding the CSIRO matter.  Townsend also extended an offer to Andrew Pratt to join the firm's Washington D.C. office as an associate.  However, after Townsend extended that offer and after he already had resigned from McGuireWoods, Mr. Pratt disclosed that he worked on a Marvell matter and participated in a conference call where CSIRO was discussed.  Upon learning of this issue (and after Marvell predictably refused to provide a protective waiver), Townsend did not go forward with hiring Mr. Pratt.  He instead works on a restricted basis as an independent contractor out of his home.  He does not have an office at Townsend and does not use a Townsend secretary.  He has no access to Townsend's files, computer network or telephone system.  He does not work or interact with any lawyers on the CSIRO team and has no access to any CSIRO files.  Mr. Pratt's assignments are on matters completely unrelated to Marvell or CSIRO.  Townsend employees have been instructed not to communicate with Mr. Pratt regarding his limited work for Marvell or any matters pertaining to CSIRO, and he has been instructed not to talk to anyone at Townsend about such work.  (Declaration of Ted Herhold ¶¶ 2–3.)

purpose of manufacturing a conflict, Marvell's attempt to disqualify Townsend here is barred by the simple fact that the law considers such an opportunistic delay a waiver of the conflict.

It is well settled that a party that knows of a potential conflict waives the right to seek disqualification if it does not act with reasonable promptness to seek redress. The "failure of a party to move timely for disqualification may result in a waiver of the right to do so. Waiver is particularly relevant when a motion to disqualify is used in an abusive manner as part of litigation tactics." American Sterilizer Co. v. Surgikos, Inc., 24 U.S.P.Q.2d 1547, 1551, 1992 WL 332102 (N.D. Tex. 1992). "Waiver of a motion for disqualification of counsel is proper where the delay in moving for disqualification is for an extended period of time, or where it is done on the eve of trial." Abney, 984 F. Supp. at 530. In Abney, this Court found that when the plaintiff had knowledge of the facts giving rise to the conflict, some of which could not have been known to the opposing party or their attorney against whom disqualification was sought, a delay of a year constituted a waiver of the disqualification motion. Id.; see also Cox v. American Cast Iron Pipe Co., 847 F.2d 725, 729 (11th Cir. 1988) ("a failure to make a timely objection may also result in a waiver"); In re Metoprolol Succinate Patent Litigation, 2005 WL 1661509 at *4 (E.D. Mo. July 8, 2005) ("The right to move to disqualify may be waived by an unreasonable delay in filing the motion."). "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion. A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed." Hertz Corp. v. Caulfield, 1992 WL 53610, *3 (E.D. La. March 10, 1992), quoting Cox, 847 F.2d at 729.[28]

---

[28]    The rule is well established and widely recognized. See, e.g., Trust Corp. of Montana v. Piper Aircraft Corp., 701 F.2d 85, 87-88 (9th Cir. 1983); Central Milk Producers Co-op. v. Sentry Food Stores, Inc., 573 F.2d 988, 992 (8th Cir. 1978); Redd v. Shell Oil Co., 518 F.2d 311, 315 (10th Cir. 1975); United States Fidelity & Guaranty Co. v. Bolding, 447 F.2d 462, 464 n. 1 (10th Cir. 1971); Milone v. English, 306 F.2d 814, 818 (D.C. Cir. 1962). Texas courts also apply the same rule, holding that a "party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint." Vaughan v. Walther, 875 S.W.2d 690 (Tex. 1994) (citing cases).

Where, as here, the facts underlying the alleged conflict are known to the moving party, the proper time to move to disqualify is at the *outset* of litigation.

> Because a disqualification motion is of an equitable nature, it is appropriate to consider the prior conduct and statements of the movant and its attorneys on the question of the movant's good faith and credibility in connection with the motion to disqualify. A motion to disqualify opposing counsel should be filed at the onset of the litigation, or with promptness and reasonable diligence once the facts upon which the motion is based have become known.

Glover v. Libman, 578 F. Supp. 748, 767 (N.D. Ga. 1983) (citations omitted).

Here, Marvell knew of the facts it now says give rise to the conflict well more than two years ago, since May 2005 when it signed the forbearance agreement with its customer who then sued CSIRO.  (Calladine Decl. Ex. 1.)  Nevertheless, from late 2005 and all through 2006, Marvell sent Townsend the patent application work it now says puts Townsend in conflict. (Steiner Decl. ¶¶ 2-4; Houghley Decl. ¶¶ 2-6; Tabibi Decl. ¶¶ 2-4.)  This continued through September 2006 when CSIRO filed its answer and counterclaims against the Microsoft plaintiffs—one of whom made an indemnity claim against Marvell in October 2006.  Marvell could have sought the disqualification of Townsend in the Microsoft case as far back as May 2005, or again in 2006 after CSIRO counterclaimed.  It could have filed its disqualification motion in the Toshiba case immediately upon the filing of that suit.

Instead, Marvell allowed CSIRO to invest millions of dollars and thousands of hours in its relationship with Townsend, as that firm mastered the technical details of CSIRO's claims and developed licensing and litigation strategy it has now been implementing for some five years.  *Marvell has acquired no new information concerning the purported "conflict" that it did not know a year, or even two years, ago.*  There is absolutely no excuse for Marvell's delay, and no reason for it except to maximize the strategic disruption on CSIRO's pursuit of its patent rights.  Because Marvell failed to act in a timely manner in seeking disqualification of Townsend for its alleged "conflict of interest," it has waived its right to bring this motion.

## V.  CONCLUSION

Marvell's only purpose here is to disrupt the orderly litigation of the '069 patent claims. As its hollow, strained and otherwise contrived presentation of the underlying facts demonstrates, there is no substance to any of Marvell's allegations.  There is no reason to stay this action on the basis of rules intended to achieve the orderly resolution of patent claims, when the effect of applying those rules here would have the opposite effect.  There is absolutely no basis for disqualifying Townsend.  Marvell's interest in this litigation does not make it adverse to CSIRO, there is no overlap between the firm's prior representation of Marvell and the '069 litigation, and Townsend has no relevant confidential information.  Marvell knew for years of all of the facts it now says mandate disqualification, even as it sent the allegedly offending work to Townsend, and once Townsend was told of Marvell's contentions, it properly withdrew.  Even if any conflict were to have arisen, Marvell has waived it.  It should not be allowed to disable CSIRO's orderly litigation of its claims by staying the litigation or depriving it of the counsel in which it has invested years of expertise and millions of dollars.

This pleading is signed and filed with permission of lead counsel.

DATED:  August 3, 2007

**KERR & WAGSTAFFE LLP**

By /s/ James M. Wagstaffe
JAMES M. WAGSTAFFE (CA BAR NO. 95535)
KEITH K. FONG (CA BAR NO. 148067)
MICHAEL NG (CA BAR NO. 237915)
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105
(415) 371-8500 Telephone
(415) 371-0500 Facsimile
email: wagstaffe@kerrwagstaffe.com
email: fong@kerrwagstaffe.com
email: mng@kerrwagstaffe.com

Attorneys for Plaintiff
COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION

43

# EXHIBIT A

**Exhibit A**
**Timeline of Significant Events**



**1/19/05**
Marvell signs indemnity agreement with Customer A

**2/2/05**
Buffalo suit filed

**2003-04**
CSIRO attempts to negotiate licenses for '069 patent

**5/5/05**
Marvell & Customer A sign forbearance agreement

**6/22/05**
Marvell inquiry to CSIRO re: license

**5/9/05**
Microsoft & Intel suits filed

**Late 2005**
Marvell sends patent work to Townsend

**2005**

**9/4/06**
Marvell signs indemnity agreement with Customer B

**10/06**
Marvell sends new wireless LAN patent application work to Townsend

**10/25/06**
Customer A's 2nd indemnity tender

**9/22/06**
Townsend files answer and counter claims in Microsoft case

**12/22/06**
CSIRO files Toshiba action

**2006**

**1/25/07**
Customer B's indemnity tender

**3/5/07**
Marvell seeks license from CSIRO

**3/13/07**
Marvell first informs Townsend of indemnity agreements

**3/21/07**
Marvell files suit against Townsend in California state court

**5/4/07**
Marvell files declaratory judgment action in this Court

**2007**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV -5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this the 3rd day of August, 2007.

DATED:  August 3, 2007                                **KERR & WAGSTAFFE LLP**


                                                                    By  /s/ Michael Ng with Permission of Lead Attorney
                                                                    JAMES M. WAGSTAFFE (CA BAR NO. 95535)
                                                                    KEITH K. FONG (CA BAR NO. 148067)
                                                                    MICHAEL NG (CA BAR NO. 23791)