IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| **MICROSOFT CORPORATION, APPLE COMPUTER, INC., HEWLETT-PACKARD COMPANY, and NETGEAR, INC.** § § § § § **Plaintiff** § § vs. § § **COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION** § § § § **Defendants** | **CASE NO.  6:06 CV 549** **PATENT CASE** |
| **COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION** § § § § **Plaintiff** § § vs. § § **TOSHIBA AMERICA INFORMATION SYSTEMS, INC., NINTENDO OF AMERICA, INC., FUJITSU COMPUTER SYSTEMS CORPORATION, ASUS COMPUTER INTERNATIONAL, D-LINK SYSTEMS, INC., BELKIN CORPORATION, ACCTON TECHNOLOGY CORPORATION USA, SMC NETWORKS, INC., and 3COM CORPORATION** § § § § § § § § § § § § § § **Defendants** | **CASE NO.  6:06 CV 550** **PATENT CASE** |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Marvell Semiconductor, Inc.'s, Marvell Asia PTE, Ltd.'s, and Marvell

Intl., Ltd.'s (collectively "Marvell") Motion to Intervene (Docket No. 161 in 6:06-CV-549 LED;

Docket No. 151 in 6:06-CV-550 LED) and Marvell's Motion to Stay Proceedings and, in the Alternative, to Disqualify Defendant's Counsel (Docket No. 166 in 6:06-CV-549 LED; Docket No. 153 in 6:06-CV-550 LED). After considering the parties' written submissions and oral arguments, the Court **DENIES** both motions.

## BACKGROUND

The present suit involves U.S. Patent No. 5,487,069 (the "'069 patent") titled "Wireless LAN." In 1999, the Institute of Electrical and Electronics Engineers ("IEEE") adopted the 802.11a standard for wireless LAN ("WLAN"), which the '069 patent's technology purportedly covers.[1] The '069 patent was assigned to Commonwealth Scientific & Industrial Research Organisation ("CSIRO").

Throughout 2003 and 2004, CSIRO attempted to negotiate license agreements with end-product manufacturers.[2] In 2004, Marvell participated in a joint defense group with parties involved in the present and other related suits. The joint defense group focused on creating a common, strategic plan for the anticipated CSIRO litigation. In 2005, the unsuccessful negotiations led to multiple lawsuits. In February 2005, CSIRO sued Buffalo Technology (USA), Inc. ("Buffalo") for patent infringement in the Eastern District of Texas, No. 6:06-CV-324 LED (the "*Buffalo* Action"). In May 2005, anticipating suit by CSIRO, Microsoft[3] and Intel filed separate declaratory judgment actions against CSIRO in the Northern District of California. On November 13, 2006, the Court granted CSIRO's summary judgment for Buffalo's infringement of the '069 patent. In December

---

[1] In 2003, the IEEE adopted the 802.11g standard, and a new 802.11n standard is forthcoming.

[2] For the purposes of clarity, this opinion involves two sets of manufacturers. One is the end-product manufacturers, the plaintiffs and defendants in the *Microsoft* and *Toshiba* Actions who make the products CSIRO claims infringe. The other is chip manufacturers, such as Marvell, who manufacture chips that are components of the end products.

[3] The co-plaintiffs include Apple Computer, Inc., Hewlett-Packard Company, and Netgear, Inc.

2

2006, the *Microsoft* and *Intel* Actions were transferred to the Eastern Distirct, No.6:06-CV-00549 LED (the "*Microsoft* Action") and No. 6:06-CV-551 LED (the "*Intel* Action"). Also in December 2006, CSIRO asserted patent infringement claims against Toshiba America Information Systems, Inc. ("Toshiba"), in No. 6:06-CV-550 LED (the *"Toshiba* Action").

In May 2007, Marvell filed a declaratory judgment action against CSIRO in the Eastern District, No. 6:06-CV-551 LED (the "*Marvell* Action"). Two months later, Marvell moved to intervene in the *Microsoft* and *Toshiba* Actions for the limited purpose of staying claims involving Marvell's customers or alternatively disqualifying CSIRO's counsel, Townsend and Townsend and Crew ("Townsend"). Marvell manufactures a chip that end-product manufacturers incorporate into their final products. CSIRO accuses those final products of infringement in the *Microsoft* and *Toshiba* Actions.

## MOTION TO STAY, IN THE ALTERNATIVE, TO DISQUALIFY

Marvell contends that if the Court stays certain claims, disqualification becomes unnecessary as Townsend will no longer be directly adverse to Marvell. Thus, the Court will first address the motion for stay, followed by the alternative motion to disqualify.

**Partial Stay**

Marvell moved to partially stay claims against Marvell's customers; however, none of Marvell's customers have joined in the motion to stay, and Hewlett Packard, one of Marvell's customers, opposes the partial stay.

*Applicable Law*

District courts have the inherent power to control their own docket, including the power to stay proceedings. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Gould v. Control Laser Corp.*, 705 F.2d 1340,1341 (Fed. Cir. 1983). In patent infringement cases, the customer-suit exception

allows a court to stay a first-filed suit against customers when the manufacturer brings a later-filed declaratory judgment action. *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir.1990); *Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 737–38 (1st Cir. 1977). Underlying the customer-suit doctrine is the preference that infringement determinations should be made in suits involving the true defendant in the plaintiff's suit, i.e., the party that controls the product's design, rather than in suits involving secondary parties, i.e. customers. *See Codex*, 553 F.2d at 737–38. "The guiding principles in the customer suit exception cases are efficiency and judicial economy." *Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Tex. Sys.*, 458 F.3d 1335, 1343 (Fed. Cir. 2006). Federal Circuit law controls whether the customer suit exception applies. *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1345–46 (Fed. Cir. 2005).

*Analysis*

Marvell does not seek to stay the *Microsoft* and *Toshiba* Actions entirely but only CSIRO's infringement claims against products that use Marvell's chips, which is one percent of the total products at issue in the *Microsoft* and *Toshiba* Actions. Marvell contends that granting the stay will provide more efficient litigation and avoid the need to disqualify Townsend.

Marvell argues that its chips are the central focus of the *Microsoft* and *Toshiba* Actions and claims the customer suit exception applies since Marvell manufactures the allegedly infringing chips and the plaintiffs in the *Microsoft* Action and defendants in the *Toshiba* Action are Marvell's customers.

CSIRO argues that Marvell's chips are mere components of the end products and that the chips do not directly infringe the '069 patent. CSIRO contends that the '069 patent covers a transceiver, which requires an antenna, power supply, and a chip. CSIRO has conceded that a direct

claim of infringement could not be made against Marvell.[4]  However, Marvell replies that since Marvell's chip causes the alleged infringement, the customer suit exception should apply.

The present suit is not the typical "customer suit exception" case where a patent holder is suing a mere "reseller" of the goods.  *See Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989).  In *Kahn v. General Motors Corp.*, the court dealt with a similar situation.  *Id*.  In *Kahn*, the patent holder sued General Motors for infringement of a patent covering AM stereo receivers.  *Id*. Motorola, the manufacturer of integrated circuit boards used in the receivers, filed for a declaratory judgment that Kahn's patent was invalid, unenforceable, and that neither Motorola nor manufacturers of the stereo receivers incorporating Motorola's parts infringed.  *Id*. at 1078.  General Motors moved to stay its suit pending the outcome of the Motorola suit, but the court found that the customer suit exception was not applicable to the facts because the second filed action would not completely resolve the issues between the parties.  *Id*. at 1082.

In *Air Products*, the patentee had sued Tesco, a drilling company, for patent infringement relating to Tesco's nitrogen production units ("NPUs").  *Air Prods. and Chems., Inc. v. MG Nitrogen Services., Inc.*, 133 F. Supp. 2d 354 (D. Del. 2001).  In its infringing NPUs, Tesco used a product supplied by Air Products.  *Id*.  Air Products later filed a declaratory judgment seeking a judgment that its product did not infringe, and Tesco requested a stay of its first-filed action pending resolution of the declaratory judgment.  *Id*.  The court found that Air Products' product was only a part of the infringing device and held the customer suit exception inapplicable because Tesco was not "merely a reseller."  *Id*. at 357.

The present facts are similar to *Kahn* and *Air Products*.  CSIRO concedes that Marvell only

---

[4] At the hearing, CSIRO again reiterated that Marvell's chips are mere components and would at most indirectly infringe the '069 patent.

5

makes a component of the end product and therefore does not and cannot directly infringe. CSIRO stated that while the Marvell chip does the "inventive magic" it does not directly infringe because it is not a transceiver, which requires an antenna and power supply. As in *Kahn* and *Air Products*, the customers' end products are what allegedly directly infringe, not the components. The *Marvell* Action would not completely resolve the issues of the *Microsoft* and *Toshiba* Actions as the fact-finder would still need to find that the customers directly infringed before finding that Marvell indirectly infringed.[5] Therefore, the customer suit exception does not apply.

Marvell also claims that the stay will provide the most efficient litigation and that the Court should use its discretion to stay the Marvell customer claims. However, Marvell waited about two years before moving to intervene and partially stay in the *Microsoft* Action and seven months before moving in the *Toshiba* Action. "The guiding principles in the customer suit exception cases are efficiency and judicial economy." *Tegic Commc'ns Corp.*, 458 F.3d at 1343. Sitting on the sidelines for two years does not promote efficiency or judicial economy; this fact alone weighs heavily against granting the partial stay.

Marvell also argues that the partial stay will eradicate the need to disqualify Townsend as CSIRO's counsel. However, at the hearing, Marvell was not able to offer reassurance that a stay would completely negate the need for disqualification. In fact, Marvell conceded that potential conflicts could arise at both the *Markman* hearing and summary judgment stage. As demonstrated at the hearing, partially staying the case without addressing the disqualification issue would prove unworkable; thus, the stay would only prolong the issue instead of efficiently disposing of it.

Therefore, to avoid the rehashing of disqualification, the Court denies the motion for stay and

---

[5] It is a cardinal rule that in the absence of direct infringement, there can be no indirect infringement. *Metabolife Labs.,Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1364 (Fed. Cir. 2004). Thus, this weighs in favor of not staying the *Microsoft* and *Toshiba* Actions pending resolution of the *Marvell* Action.

addresses the alternative motion to disqualify.

**Disqualification**

The parties dispute whether Marvell should be considered a current or former client of Townsend. Notwithstanding whether Marvell is considered a current or former client, Townsend argues that Marvell has waived its right to bring a motion to disqualify.

*Facts*

In 2002, CSIRO approached Townsend regarding a licensing strategy for the '069 patent. As mentioned above, in 2003 and 2004, CSIRO, represented by Townsend, attempted to negotiate license agreements with end-product manufacturers. While CSIRO attempted negotiations, Marvell and other parties involved in the *Microsoft*, *Intel*, and *Toshiba* Actions participated in a joint defense group focusing on the '069 patent and potential litigation related to it. On January 23, 2005, Marvell signed an indemnity agreement with Customer A.[6] The indemnity agreement purportedly requires Marvell to indemnify Customer A in certain patent infringement claims.

On February 2, 2005, CSIRO filed its first action against Buffalo. Three months later, Marvell and Customer A signed a forbearance agreement tolling Customer A's indemnification claims. Four days later, Customer A joined in filing the *Microsoft* Action. On June 22, 2005, Marvell's outside counsel contacted Townsend to inquire about a license for the '069 patent. Townsend apparently advised Marvell's outside counsel that a license was unnecessary as CSIRO had no intention of suing component manufacturers.

In late 2005, Marvell began sending patent application work to Townsend. In February 2006, Marvell's outside counsel again contacted Townsend requesting a license. Again reassuring Marvell

---

[6] Marvell has not identified Customer A to either the Court or CSIRO. Marvell claims that Customer A's identity is confidential. As identity is not necessary to rule on the motion, the Court will refer to the customer as Customer A. Marvell also names two other customers whose identities are claimed to be confidential. They will be referred to as Customer B and Customer C.


addresses the alternative motion to disqualify.

**Disqualification**

The parties dispute whether Marvell should be considered a current or former client of Townsend. Notwithstanding whether Marvell is considered a current or former client, Townsend argues that Marvell has waived its right to bring a motion to disqualify.

*Facts*

In 2002, CSIRO approached Townsend regarding a licensing strategy for the '069 patent. As mentioned above, in 2003 and 2004, CSIRO, represented by Townsend, attempted to negotiate license agreements with end-product manufacturers. While CSIRO attempted negotiations, Marvell and other parties involved in the *Microsoft*, *Intel*, and *Toshiba* Actions participated in a joint defense group focusing on the '069 patent and potential litigation related to it. On January 23, 2005, Marvell signed an indemnity agreement with Customer A.[6] The indemnity agreement purportedly requires Marvell to indemnify Customer A in certain patent infringement claims.

On February 2, 2005, CSIRO filed its first action against Buffalo. Three months later, Marvell and Customer A signed a forbearance agreement tolling Customer A's indemnification claims. Four days later, Customer A joined in filing the *Microsoft* Action. On June 22, 2005, Marvell's outside counsel contacted Townsend to inquire about a license for the '069 patent. Townsend apparently advised Marvell's outside counsel that a license was unnecessary as CSIRO had no intention of suing component manufacturers.

In late 2005, Marvell began sending patent application work to Townsend. In February 2006, Marvell's outside counsel again contacted Townsend requesting a license. Again reassuring Marvell

---

[6] Marvell has not identified Customer A to either the Court or CSIRO. Marvell claims that Customer A's identity is confidential. As identity is not necessary to rule on the motion, the Court will refer to the customer as Customer A. Marvell also names two other customers whose identities are claimed to be confidential. They will be referred to as Customer B and Customer C.

that CSIRO did not intend to sue component manufacturers, Townsend told Marvell that no license was necessary. In June 2006, Marvell's general counsel, informed Townsend that its patent work was unacceptable and that Marvell would no longer send patent work to Townsend.

On September 4, 2006, Marvell signed an indemnity agreement with Customer B. Three weeks later, CSIRO filed its answer and counterclaims of infringement in both the *Microsoft* and *Intel* Actions. In October 2006, Marvell resumed sending patent work to Townsend, and Customer A made a second tender under the indemnity agreement. On December 22, 2006, CSIRO filed the *Toshiba* Action accusing more end-product manufacturers of infringement. One month later, Customer B made a tender under its indemnity agreement.

Around March 5, 2007, Marvell contacted Townsend to inquire about a license for the third time. This precipitated a slew of communications between Marvell and Townsend. Townsend informed Marvell that it would need a written conflict waiver in order for Townsend to negotiate the license between Marvell and CSIRO. Marvell responded by stating that it would agree to a waiver for prospective conflicts but not for past conflicts. On March 13, 2007, Marvell informed Townsend of indemnity agreements with customers in the *Toshiba* and *Microsoft* Actions and stated that it believed Townsend had violated ethical rules and its duty of loyalty to Marvell. Eight days later, Marvell filed suit against Townsend in a California state court.

In May 2007, Marvell filed a declaratory judgment action against CSIRO.[7] On May 16, 2007, Marvell moved for a preliminary injunction in the state court action to enjoin Townsend from representing CSIRO in the *Marvell* and *Toshiba* Actions. On June 13, 2007, the state court ruled that it could not enjoin a law firm from representing a party in a federal suit. On July 3, 2007, Marvell sought to intervene in the *Microsoft* and *Toshiba* Actions for the limited purpose of seeking the

---

[7] No. 6:06-CV-551 LED (the "*Marvell* Action").

partial stay or alternatively the disqualification.

*Applicable Law*

As disqualification is a procedural matter not unique to patent law, regional circuit law applies. *Picker Int'l., Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 580–81 (Fed. Cir. 1989). The movant bears the burden of proving that disqualification is warranted. *In re Am. Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981). "Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Dresser Indus., Inc.*, 972 F.2d 540, 544 (5th Cir. 1992). Court are not bound by state ethical rules; they may also look to national norms, such as the ABA Model Rules. *In re Am. Airlines, Inc.*, 972 F.2d at 610. The attorney disqualification rules are not to be mechanically applied. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th. Cir. 1989). "All of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995).

The ABA Model Rules and the Texas Rules of Professional Conduct propound different tests for conflicts of interest arising in concurrent and former representations. Thus, the first issue is whether Marvell is a current or former client of Townsend.

ABA Model Rule 1.7 governs concurrent conflicts of interest:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if :
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or third person or by a personal interest of the lawyer.

ABA MODEL RULE 1.7(a). The Texas Rule requires not only that the clients are directly adverse but

also that the matters are substantially related. *See* TEX. R. DISCIPLINARY P. 1.06(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A-1 (Vernon Supp. 1997). The Fifth Circuit has shown a preference for the more stringent ABA Model Rule. *In re Dresser*, 972 F.2d at 544. Thus, the Court will apply the Model Rule to the present facts.

For former representations, the movant must prove either that the present and former matters are substantially related or that the former attorney actually posses relevant confidential information. *In re Am. Airlines*, 972 F.2d at 615; *see also,* ABA MODEL RULE 1.09; TEX. R. DISCIPLINARY P. 1.09. Under the substantially related test, the movant must prove: "1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations." *Id*. at 614.

<u>Analysis</u>

*Whether Marvell is a Current or Former Client*

Neither party disputes that up to March 2007, Townsend represented both CSIRO and Marvell. Also, neither party disputes that after being informed of the indemnity agreements, Townsend sent a letter to Marvell purporting to end the attorney-client relationship. Marvell claims that Townsend attempted to jettison it as a client, and Townsend claims that Marvell created the conflict thereby allowing Townsend to terminate the relationship as soon as it was apprised of the conflict.

Marvell argues that Townsend cannot cure a conflict by jettisoning one client to represent another. Courts have referred to this as the "hot potato" doctrine. *See, e.g., Pioneer-Standard Elecs., Inc. v. Cap Gemini Am., Inc.*, 2002 WL 553460 *2 (N.D. Ohio 2002); *Picker Int'l, Inc. v.*

*Varian Assocs., Inc.*, 670 F. Supp. 1363, 1366 (N.D. Ohio 1987).[8] Under the doctrine, a firm cannot avoid the more stringent current client rules by dropping a client in order to represent another adverse client. *Picker Int'l*, 670 F. Supp. at 1366.

Townsend counters that the "thrust upon" doctrine is an exception to the "hot potato" doctrine and applies to the present situation.[9] The "thrust upon" exception applies when unforeseeable developments cause two current clients to become directly adverse. *See Bd. of Regents of the Univ. of Nebraska v. BASF Corp.*, 2006 WL 2385363, at *10 (discussing the "thrust upon" exception and denying disqualification because of an "unforeseeable development"); *see also, e.g., Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1498–99 (allowing defense counsel to withdraw after discovering conflict and applying former representation rules even though defense counsel concurrently represented the plaintiff in another, unrelated suit); *Florida Ins. Guar. Ass'n, Inc. v. Carey Canada, Inc.*, 749 F. Supp. 255, 260–61 (S.D. Fla. 1990) (finding that when a firm learns of a conflict and immediately withdraws, the proper standard is the former representation rule).

Model Rule 1.7, Comment 5 is also instructive and provides the underlying rationale for the "thrust upon" exception:

> Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. *Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict.* The

---

[8] None of Marvell's authority on the "hot potato" doctrine is from the Fifth Circuit nor any Fifth Circuit district courts. Neither party cited to, nor could the Court find, any Fifth Circuit authority adopting the "hot potato" doctrine.

[9] Again, none of Townsend's authority on the "thrust upon" doctrine is from the Fifth Circuit nor any Fifth Circuit district courts. Neither party cited to, nor could the Court find, any Fifth Circuit authority adopting the "thrust upon" doctrine.

>lawyer must seek court approval where necessary and take steps to minimize harm to the clients. See Rule 1.16. The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. See Rule 1.9(c).

ABA MODEL RULE 1.7 cmt 5 (emphasis added).[10]

Marvell claims that the conflict arose in September 2006, when CSIRO filed its counterclaim in the *Microsoft* Action, and in December 2006, when CSIRO filed the *Toshiba* Action. It is undisputed that Townsend had no actual knowledge of indemnity agreements between Marvell and its customers. Rather, Marvell contends that Townsend should have known about the possibility of indemnity agreements because such indemnity agreements are allegedly an industry standard.

Although attorneys have the affirmative duty to seek out and discover possible conflicts, clients should not actively conceal potential conflicts from their counsel. *See Klein v. Churchill Coal Corp.*, 612 F. Supp. 247, 251 (S.D.N.Y. 1985) ("a person may not immunize himself from suit by a lawyer by fraudulently maneuvering the lawyer into a position where he might be said to have a conflict of interest"). Marvell acknowledges that prior to March 13, 2007, it never disclosed the indemnity agreements. Marvell takes the position that it had no reason to disclose its indemnity obligations as those agreements might be used against them in licensing negotiations with CSIRO.

While Marvell is free to choose which facts it does and does not disclose to counsel, Marvell cannot subsequently assert those purposefully withheld facts as a means to disqualify. This is the exact scenario Comment 5 contemplates.

Marvell offers conclusory statements, not evidence, that indemnity agreements are industry standard, and Marvell admits to withholding facts from Townsend. Marvell now asserts that the

---

[10] "The Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule. The Preamble and this note on Scope provide general orientation. The Comments are intended as guides to interpretation, but the text of each Rule is authoritative." ABA MODEL RULE Scope.

very indemnity agreements that it kept concealed constituted direct adversity and gave rise to the conflicts. Marvell chose to keep the agreements hidden; accordingly, the tenders for indemnity became "unforeseeable developments" to Townsend. Townsend subsequently withdrew from representing Marvell via a March 15, 2007 letter. As the conflict was thrust upon Townsend, Townsend was justified in dropping Marvell as a client. Therefore, the former representation rules apply.[11]

*Former representation*

As discussed above, Marvell and Townsend do not dispute that an attorney-client relationship existed. Thus the relevant inquiries are whether the matters are substantially related or whether Townsend possesses relevant confidential information.

Substantially related

In determining if the present and former matters are substantially related, courts have identified three relevant factors: "(1) the factual similarities between the current and former representations, (2) the similarities between the legal question posed, and (3) the nature and extent of the attorney's involvement with the former representation." *Power Mosfet Techs, L.L.C. v. Siemens AG*, 2002 WL 32785219, at *2, No. 2:99-CV-168 (E.D. Tex. 2002) (Folsom, J.); *Dieter v. Regents of Univ. of California*, 963 F. Supp. 908, 912 (E.D. Cal. 1997) (citing *Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 760 (2nd Cir. 1975)). Marvell contends that all three factors support disqualification.

Marvell claims that Townsend's former representation of Marvell and current representation

---

[11]Marvell contends that Townsend continued to represent it after the March 15, 2007 letter. However, the evidence shows that Townsend was attempting to comply with Model Rule 1.16 by preparing files for transfer to another counsel of Marvell's choosing. Although Townsend did further work on patent applications, the evidence shows that the work was done to meet approaching deadlines, which is in accordance with Model Rule 1.16. Marvell offered no evidence to show that it sent confidential information or that Townsend actively engaged in representing Marvell past March 15, 2007.

of CSIRO are factually and legally similar. According to Marvell, Townsend performed vast amounts of intellectual property work for Marvell on WLAN technology, the same technology at issue in the '069 patent litigation. Addressing the first two factors, Marvell only offers broad statements that Townsend worked on many matters related to Marvell's WLAN products, but Marvell does not address how these products relate to the CSIRO litigation.

Marvell also claims that in October of 2006 Townsend worked on nine patent applications that "involved wireless LAN technologies." Again, Marvell simply states that these patents relate to products at issue in the *Microsoft* and *Toshiba* Actions. Marvell offers no explanation on how patent applications started in October 2006 relate to products involved the '069 litigation, which began eighteen months earlier. Marvell's argument hinges on the fact that the work involved related subject matter, WLAN technology. However, the sole presence of related subject matter does not establish a substantial relationship. *See Biax Corp. v. Fujitsu Computer Sys. Corp.*, 2007 WL 1466639, at *2, No. 2:06-CV-364 (Ward, J.) (finding that both representations involving server architecture was too broad to establish a substantial relationship).

Marvell states that Townsend's former representation was broad and extensive. Again, Marvell only points to the related subject matter. It offers no evidence that any of Townsend's prior work relates to the products at issue in the *Microsoft* and *Toshiba* Actions. While Marvell is not required to produce the actual documents to prove a substantial relationship, Marvell does have the burden to prove that the matters are substantially related. This burden was not met.

### Relevant Confidential Information

Marvell also contends that Townsend actually received relevant confidential information. Marvell claims that Townsend gained extensive knowledge regarding the operation of Marvell's current products, the direction of Marvell's future products, and Marvell's litigation strategy.

Townsend argues that Marvell has failed to identify any specific relevant confidential information disclosed to Townsend.

Marvell identifies two specific pieces of confidential information. First, Marvell states that when Townsend represented Marvell in a trademark dispute, Townsend became privy to Marvell's litigation and settlement strategy. However, Marvell fails to show how knowledge of these strategies is relevant to the *Microsoft* or *Toshiba* Actions. Although Marvell may have to indemnify its customers, it has not moved to fully intervene in this case. In fact, Marvell filed a separate suit against CSIRO in which Townsend does not currently represent CSIRO.[12] As Marvell is not directly involved in these cases, Marvell's litigation and settlement strategies would not be relevant.

Marvell also claims that Townsend hired Andrew Pratt, an attorney who received a confidential memorandum regarding the CSIRO-Marvell litigation strategy while employed at his previous firm. Even though Pratt claims he never received the memorandum, Townsend has produced evidence that it never completed the hiring of Pratt. During its conflicts check, Townsend identified the potential conflict and declined to employ Pratt. While Pratt does do contract work for Townsend, he works from home and is neither employed by the firm nor has access to Townsend's files. Townsend has also instructed Pratt and its attorneys not to discuss the CSIRO litigation with each other. Accordingly, this does not require Townsend's disqualification.

Marvell makes general assertions that Townsend talked to inventors and learned the background of Marvell's products, some of which are allegedly involved in the *Microsoft* and *Toshiba* Actions. However, Marvell does not identify the actual overlapping products or the specific confidential information learned. A severe remedy such as disqualification cannot be granted on

---

[12] At the hearing, Townsend stated that it may assume representation of CSIRO in the *Marvell* Action. The potential issue of disqualification in that case is not currently before the Court, so nothing contained herein should be read as support for or against disqualification in that case.

generalities. While Marvell is not required to produce the actual confidential information, it has the burden to delineate with specificity what confidential information was shared. Marvell failed to meet this burden. *See Biax Corp.*, 2007 WL 1466638, at *3 (finding that defendant failed to meet burden with general allegations that firm had learned information regarding product operation and defendant's engineering operations). Marvell argues that it disclosed confidential information but Marvell either does not specifically identify it or fails to state how it is relevant to the *Microsoft* or *Toshiba* Actions.

*Waiver*

Although disqualification is not appropriate, it is important to note that even if it were, Marvell has waived its right to move to disqualify Townsend. "Waiver of a motion for disqualification of counsel is proper where the delay in moving for disqualification is for an extended period of time, or where it is done on the eve of trial." *Abney v. Wal-Mart*, 984 F. Supp. 526, 530 (E.D. Tex. 1997) (Schell, C.J.). Waiver is important "when a motion to disqualify is used in an abusive manner as part of litigation tactics." *Atasi Corp. v. Seagate Tech.*, 847 F.2d 826, 832 (Fed. Cir. 1988).

Townsend argues that Marvell possibly knew of the conflict in 2004 when Marvell joined the joint defense group but definitely knew in May 2005 when the *Microsoft* Action was filed and Marvell signed the forbearance agreement with Customer A. Marvell argues that because the conflict did not arise until September 2006, when CSIRO filed its counterclaims, Marvell did not delay by filing in July 2007.

It is undisputed that Marvell knew of the *Microsoft* Action back in 2005. It is also undisputed that Marvell knew Townsend represented CSIRO from the onset of that action, which was before Marvell sent Townsend the patent work that Marvell now claims was substantially

16

related. When Microsoft filed its declaratory judgment action, Marvell should have been aware that CSIRO would bring its compulsory counterclaims of infringement, yet Marvell stood on the sidelines and waited two years before moving to intervene. In fact, Marvell concealed the conflict from CSIRO and Townsend until March 13, 2007, nearly six months after Marvell claims the conflict arose.

Removing Townsend now would severely prejudice CSIRO. For the past two years, Townsend has become extensively familiar with the case and expended millions of dollars in preparation. Marvell waived its right to bring a motion to disqualify. Marvell's alternative request to disqualify is denied.

## MOTION TO INTERVENE

Marvell moved to intervene for the limited purpose of filing its Motion to Stay, or in the Alternative, to Disqualify. As that motion was denied, the Motion to Intervene is denied as moot.

## CONCLUSION

For the above reasons, the Court **DENIES** Marvell's Motion to Intervene (Docket No. 161 in 6:06-CV-549 LED; Docket No. 151 in 6:06-CV-550 LED) and Marvell's Motion to Stay Proceedings and, in the Alternative, to Disqualify Defendant's Counsel (Docket No. 166 in 6:06-CV-549 LED; Docket No. 153 in 6:06-CV-550 LED).

**So ORDERED and SIGNED this 13th day of December, 2007.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**