IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington Corporation, HEWLETT-PACKARD COMPANY, a Delaware corporation, and NETGEAR, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>        Defendant. | Case No.  6:06-cv-00549-LED<br><br>**Jury Trial Demanded**<br><br>**Hon. Leonard E. Davis**<br><br>**MICROSOFT CORPORATION'S REPLY AND AFFIRMATIVE DEFENSES TO CSIRO'S COUNTERCLAIMS** |
| COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>        Counterclaimant,<br><br>   v.<br><br>MICROSOFT CORPORATION, a Washington Corporation, HEWLETT-PACKARD COMPANY, a Delaware corporation, and NETGEAR, INC., a Delaware corporation,<br><br>        Counterdefendants. | |

## MICROSOFT CORPORATION'S REPLY AND AFFIRMATIVE DEFENSES TO CSIRO'S COUNTERCLAIMS

Microsoft Corporation ("Microsoft") files its Reply and Affirmative Defenses to Commonwealth Scientific and Industrial Research Organisation's ("CSIRO") Counterclaims admitting those facts specifically admitted below and denying all others averred in CSIRO's Counterclaims, and states as follows:

## CSIRO'S COUNTERCLAIMS

### I. PARTIES

150.    Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 150 of CSIRO's Counterclaims and, therefore, denies those allegations.

151.    Microsoft admits the allegations of paragraph 151 of CSIRO's Counterclaims.

152.    Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 152 of CSIRO's Counterclaims and, therefore, denies those allegations.

153.    Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 153 of CSIRO's Counterclaims and, therefore, denies those allegations.

### JURISDICTION AND VENUE

154.    Microsoft admits that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Microsoft further admits that CSIRO alleges an action for patent infringement that arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, but Microsoft expressly denies any liability thereunder.  Microsoft does not contest venue in this case in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b). Microsoft admits that it has done business in this District.  Microsoft denies the remaining allegations of paragraph 154 of CSIRO's Counterclaims that relate to Microsoft.  Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 154 of CSIRO's Counterclaims that relate to the other counter-defendants and, therefore, denies those allegations.

### FIRST COUNTERCLAIM: INFRINGEMENT OF U.S. PATENT NO. 5,487,069

155.    Microsoft admits that United States Patent No. 5,487,069 (the "'069 patent") is entitled "Wireless LAN" and issued on January 23, 1996.  Microsoft denies that the patent was

duly and legally issued.  Microsoft lacks sufficient knowledge to admit or deny the remaining allegations of paragraph 155 of CSIRO's Counterclaims and, therefore, denies those allegations.

156.    Microsoft denies the allegations of paragraph 156 of CSIRO's Counterclaims.

157.    Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 157 of CSIRO's Counterclaims and, therefore, denies those allegations.

158.    Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 158 of CSIRO's Counterclaims and, therefore, denies those allegations.

159.    Microsoft denies the allegations of paragraph 159 that relate to Microsoft. Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 159 of CSIRO's Counterclaims that relate to the other counter-defendants and, therefore, denies those allegations.

160.    Microsoft denies the allegations of paragraph 160 that relate to Microsoft. Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 160 of CSIRO's Counterclaims that relate to the other counter-defendants and, therefore, denies those allegations.

161.    Microsoft denies the allegations of paragraph 161 that relate to Microsoft. Microsoft lacks sufficient knowledge to admit or deny the allegations of paragraph 161 of CSIRO's Counterclaims that relate to the other counter-defendants and, therefore, denies those allegations.

## PRAYER FOR RELIEF

162.    Microsoft hereby incorporates by reference its answers to all paragraphs in CSIRO's Counterclaims as though fully set forth herein.  Microsoft denies that CSIRO is entitled to any relief whatsoever from Microsoft as prayed for or otherwise.

## DEMAND FOR JURY TRIAL

Microsoft admits that CSIRO demands a trial by jury on all issues triable by jury pursuant to Federal Rule of Civil Procedure 38(b).  Microsoft demands a trial by jury on all issues triable by jury presented in its amended complaint, CSIRO's counterclaims and in reply to CSIRO's counterclaims, pursuant to Federal Rule of Civil Procedure 38(b).

## AFFIRMATIVE DEFENSES

In addition to the defenses described below, Microsoft specifically reserves the right to allege additional defenses as they become known through the course of discovery.  Moreover, by asserting these affirmative defenses, Microsoft does not assume any burden of proof that does not otherwise apply.

### First Affirmative Defense

1.     Neither Microsoft nor its customers nor suppliers directly infringe, either literally or under the doctrine of equivalents, or induce or contribute to the infringement of, any valid claim of the '069 patent.

### Second Affirmative Defense

2.     The claims of the '069 patent are invalid because they fail to comply with the conditions and requirements for patentability set forth in 35 U.S.C. § 1 et seq., including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, 118, 132, and 256.

### Third Affirmative Defense

3.     CSIRO's enforcement of the '069 patent is barred in its entirety by the doctrine of equitable estoppel.  This estoppel is created by, but not limited to, CSIRO's failure to fulfill its assurance to the Institute of Electrical and Electronics Engineers ("IEEE") that it would license the '069 patent on reasonable and non-discriminatory terms.

4.      Microsoft and its customers and suppliers have been and continue to be prejudiced by CSIRO's failure to honor the promise it made to the IEEE, which led to the 802.11a/g and/or draft 802.11n standards.   As a result, the substantial investment made by Microsoft and its customers and suppliers in research and development, design, manufacture, sales and marketing of Microsoft's products has been threatened.

5.      CSIRO is barred from enforcing the '069 patent against Microsoft or its customers or suppliers as a result of CSIRO's misleading representation to the IEEE and other unlawful conduct.

## Fourth Affirmative Defense

6.      The '069 patent is unenforceable for patent misuse, due to CSIRO's continuing unlawful attempts to enforce the '069 patent as alleged in Microsoft's complaint.

7.      On information and belief, despite CSIRO's licensing practice and its knowledge and awareness that the '069 patent is invalid and unenforceable, CSIRO has attempted and continues to attempt to improperly obtain the economic advantage of injunctive relief and/or monetary damages against Microsoft and its customers and suppliers.

## Fifth Affirmative Defense

8.      CSIRO is estopped from alleging that wireless LAN components that are allegedly compliant or compatible with the IEEE 802.11a/g and/or draft 802.11n standards infringe any claims of the '069 patent, due to statements made and actions taken before the United States Patent and Trademark Office ("PTO") by the '069 patent applicants and their attorneys in order to obtain issuance of the '069 patent, and statements and actions made by CSIRO related to the IEEE.  Further, CSIRO is also estopped from seeking damages in this case, including seeking any damages exceeding a reasonable and non-discriminatory rate.

9.      On October 26, 1998, Vic Hayes, Chair of the IEEE P802.11 group, sent CSIRO a letter requesting that, if CSIRO contended that the '069 patent was needed to implement the 802.11a amendment, CSIRO give its assurance that it would offer a license on reasonable and nondiscriminatory terms and conditions to all applicants.

10.     CSIRO sent the IEEE such a letter of assurance ("LOA") on December 4, 1998, confirming CSIRO's position that the '069 patent may be needed to implement 802.11a and committing that it would grant a nonexclusive license on a "non discriminatory basis and on reasonable terms and conditions including its then-current royalty rates."

11.     CSIRO then confirmed to members of the IEEE and others that its LOA applied to other amendments of the 802.11 standard.

12.     CSIRO's assurances and promises are expressly made as irrevocable.

13.     Upon information and belief, CSIRO's actions caused the IEEE and its members/participants (including companies with respect to which CSIRO is now alleging claims of infringement under the '069 patent) to reasonably rely upon the representation by CSIRO that it would license on RAND terms.  In reliance on CSIRO's representations, these IEEE members and participants have invested substantial resources in product research, design, manufacturing, sales, marketing and customer support.

14.     CSIRO has licensed the '069 patent on several occasions.  On each of those occasions, the licenses required the respective licensee to pay an amount equal to a fraction of the total cost of the wireless chipset allegedly practicing the '069 patent.  The license rate obtained by CSIRO on these licenses is consistent with the value of the patent as assessed by CSIRO's own financial consultants, hired to value the '069 patent.

15.     After granting several licenses on what CSIRO believed to be RAND terms, CSIRO has flatly refused to license the '069 Patent on RAND terms to any other party. CSIRO now demands rates representing a several thousand percent increase over rates paid on volume sales under the original licenses granted.

16.     Indeed, the rates now demanded by CSIRO in effect would equate to nearly a 100% royalty on wireless chips compliant with the relevant 802.11 amendments.

17.     Further, CSIRO's current royalty demands are not only inconsistent with its historical licensing practices, and its own independent consultant's report, but also (1) far exceed the royalty rates offered by other patentees who claim to own other essential 802.11 patents, (2) do not account for royalty stacking in the 802.11 standard, (3) are divorced from the economic realities of the wireless LAN industry, (4) discriminate in favor of current licensees, and (5) are unsupported by any legal test.

18.     IEEE participants and others, including Microsoft and Microsoft's customers and suppliers, are and have been materially prejudiced by CSIRO in refusing to license at RAND rates.

**Sixth Affirmative Defense**

19.     CSIRO's enforcement of the '069 patent is barred in its entirety by the equitable doctrine of laches.

**Seventh Affirmative Defense**

20.     CSIRO is not entitled to injunctive relief because any injury to CSIRO is not immediate or irreparable, and CSIRO has an adequate remedy at law for any claims it can prove. Furthermore, CSIRO has publicly and legally committed to license the '069 patent on reasonable, non-discriminatory and non-exclusive terms. Thus, even if CSIRO should prevail on

the issues of infringement, enforceability, and validity, CSIRO has no right to an injunction with respect to that patent.

### Eighth Affirmative Defense

21.    CSIRO's claims for relief are barred, in whole or in part, by the equitable doctrine of unclean hands.

### Ninth Affirmative Defense

22.    CSIRO is barred by 35 U.S.C. § 288 from recovering any costs associated with this suit.

### Tenth Affirmative Defense

23.    On information and belief, some or all of CSIRO's claims for relief concerning the '069 patent are limited by failure to comply with the marking and notice requirements of 35 U.S.C. § 287(a).

### Eleventh Affirmative Defense

24.    As to some or all of CSIRO's claims concerning the '069 patent, CSIRO's recovery for alleged infringement, if any, is limited to any alleged infringement committed no more than six years prior to the filing of its counterclaim, pursuant to 35 U.S.C. § 286.

### Twelfth Affirmative Defense

25.    To the extent that CSIRO is entitled to any relief for alleged infringement of the '069 patent, some or all of CSIRO's remedies are limited under 28 U.S.C. § 1498(a).

### Thirteenth Affirmative Defense

26.    The '069 patent is unenforceable due to inequitable conduct committed during its prosecution.  On information and belief, the named CSIRO inventors and/or others substantively involved in the prosecution of the application leading to the '069 patent were aware of

information material to the patentability of the claims of the '069 patent, and they withheld that information from the United States Patent and Trademark Office ("PTO") with the intent to deceive the PTO.  The withholding of material prior art with the intent to deceive the PTO is a violation of the duty of disclosure under 37 C.F.R. § 1.56 and constitutes inequitable conduct.

27.    The duty to disclose was a continuing one, continuing until and through the date of issuance of the '069 Patent.

28.    On February 3, 1995, CSIRO filed with the PTO an Information Disclosure Statement ("IDS") in alleged compliance with the duty of disclosure set forth in 37 C.F.R. 1.56.

29.    Upon information and belief, the following are specific items of prior art that CSIRO and the named inventors identified below intentionally withheld from the PTO.

**The Percival Paper:**

30.    While the IDS disclosed certain prior art publications to the PTO, it did not disclose a publication entitled "Wireless Systems at High Bit Rates – Technical Challenges" ("the Percival paper").

31.    The Percival paper was authored by two of the CSIRO researchers named as inventors in the '069 patent, Dr. Terence Percival and Dr. John O'Sullivan, as well as a third CSIRO author, Alan Young.

32.    On information and belief, CSIRO published, distributed, and presented the Percival Paper to members of the public on November 12, 1992 at the First International Workshop on Mobile and Personal Communications Systems held at the University of South Australia in Adelaide, Australia.

33.     The Percival paper was a product of the CSIRO wireless LAN research that resulted in the '069 patent.  Every page of the paper bears the words "CSIRO Division of Radiophysics," and the "Acknowledgments" section of the paper states the following:

> The work presented here is a summary of the barriers and solutions to providing a high-speed WLAN system.  The work is a result of the discussions held over the last twelve months with a large number of colleagues in the CSIRO Institute of Information Science and Engineering and Macquarie University.

34.     Because the Percival paper was published more than one year prior to the actual filing date of the U.S. application leading to the '069 patent (i.e., November 23, 1993), it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

35.     The Percival paper discloses all of the elements of several of the issued and originally-filed claims of the '069 patent, and it discloses most, if not all, of the elements of the remaining issued and originally-filed claims.

36.     Furthermore, no reference considered by the PTO examiner during the prosecution of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the Percival paper discloses.

37.     For at least these reasons, the Percival paper is highly material to the patentability of both the issued and the originally-filed claims of '069 patent.

38.     At least two of the named inventors, as described above, were aware of the Percival paper at, before, and during the filing of the IDS and the application that led to the '069 patent.

39.     At least two of the named inventors, as described above, intentionally did not disclose the Percival paper to the PTO and/or intentionally acted in such a way to ensure that the Percival paper was not disclosed to the PTO.

40.     At least two of the named inventors, as described above, intentionally did not disclose the Percival paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of the application that led to the '069 patent.

**The Barry Paper:**

41.     The IDS also did not disclose a publication entitled "High-Speed Nondirective Optical Communications for Wireless Networks" ("the Barry paper"), which was authored by John R. Barry, Joseph M. Kahn, Edward A. Lee, and David G. Messerschmitt.

42.     The Barry paper was known to at least two of the '069 patent inventors, Dr. Terence Percival and Dr. John O'Sullivan, because it was cited in the Percival paper.

43.     The Barry paper disclosed a wireless LAN using multicarrier modulation and was published in the November 1991 issue of IEEE Network Magazine, a printed publication widely disseminated to persons of ordinary skill in the relevant art.

44.     Because the Barry paper was published more than one year prior to the actual filing date of the application that led to the '069 patent, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

45.     The Barry paper discloses all of the elements of several of the originally-filed claims of the '069 patent, and it discloses most, if not all, of the elements of the remaining issued and originally-filed claims, and was material to the patentability of the '069 patent.

46.     At least two of the named inventors, as described above, were aware of the Barry paper at, before, and during the filing of the IDS and the application that led to the '069 patent.

47.    At least two of the named inventors, as described above, intentionally did not disclose the Barry paper to the PTO and/or intentionally acted to ensure that the Barry paper was not disclosed to the PTO.

48.    At least two of the named inventors, as described above, intentionally did not disclose the Barry paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of the application that led to the '069 patent.

**The Rault Paper:**

49.    The IDS also did not disclose a publication entitled "The Coded Orthogonal Frequency Division Multiplexing (COFDM) Technique, and its Application to Digital Radio Broadcasting Towards Mobile Receivers" by J.C. Rault, D. Castelain, and B. Le Floch ("the Rault paper"), which was published, distributed, and presented to members of the public in 1989.

50.    The abstract of the publication states the following:[1]

> The broadcasting channel towards mobile receivers, especially in a dense urban area, is particularly hostile, which makes the transmission of high bit rate very challenging.
>
> The conjunction of an Orthogonal Frequency Division Multiplexing (OFDM) technique and a convolutional coding scheme (associated to a Viterbi decoding algorithm) is a promising solution (COFDM) studied at CCETT, that is suitable to cope with such a channel.
>
> In the first part of the paper, the theoretical principles of the system are detailed. The second part concerns the realization of a complete COFDM system, designed within the framework of the DAB (Digital Audio Broadcasting) EUREKA 147 project, which is able to broadcast 5.6Mbit/s in a bandwidth of 7MHz. For the time being, this rate corresponds to 16 high quality stereophonic programs. Finally, network aspects are pointed out as far as the introduction of a new radio broadcasting service is concerned.

---

[1] CH2682 – 3/89/0000-0428, © 1989 IEEE, CSI0061454.

51.     Because the Rault paper was published more than one year prior to the actual filing date of the application that led to the '069 patent, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

52.     The Rault paper discloses most or all of the elements of the issued and originally-filed claims of the '069 patent, and was material to the patentability of the '069 patent.

53.     At least one of the named inventors, Dr. Percival, was aware of the Rault paper before the issuance of the '069 patent.

54.     At least one of the named inventors, Dr. Percival, intentionally did not disclose the Rault paper to the PTO and/or intentionally acted in such a way to ensure that the Rault paper was not disclosed to the PTO.

55.     At least one of the named inventors, Dr. Percival, intentionally did not disclose the Rault paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of the application that led to the '069 patent.

**The Le Floch Paper:**

56.     The IDS also did not disclose a publication entitled "Digital Sound Broadcasting to Mobile Receivers" by Bernard Le Floch, Roselyne Halbert-Lassalle, and Damien Castelain ("the Le Floch paper"), which was published, distributed, and presented to members of the public in 1989.

57.     The Le Floch paper's "system" is outlined as follows:[2]

> The system described in this article, combining spectrum and power efficiency, is mainly based on the conjunction of the Orthogonal Frequency Division Multiplexing technique (already proposed for HF data transmission in an ionospheric channel or for

---

[2] 0098 3063/89/0200 0493501, © 1989 IEEE, CSI0042438.

transmissions through telephone networks [3] [4]), and a coding strategy associated with diversity in the frequency domain.

58.    Because the Le Floch paper was published more than one year prior to the actual filing date of the application that led to the '069 patent, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

59.    The Le Floch paper discloses most or all of the elements of the issued and originally-filed claims of the '069 patent, and was material to the patentability of the '069 patent.

60.    At least one of the named inventors, Dr. Percival, was aware of the Le Floch paper before the issuance of the '069 Patent.

61.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Le Floch paper to the PTO and/or intentionally acted to ensure that the Le Floch paper was not disclosed to the PTO.

62.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Le Floch paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of the application that led to the '069 patent.

**The Bingham Paper:**

63.    The IDS also did not disclose a publication entitled "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come" by John A. C. Bingham ("the Bingham paper"), which was published, distributed, and presented to members of the public in 1990.

64.    Because the Bingham paper was published more than one year prior to the actual filing date of the application that led to the '069 patent, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

65.    The Bingham paper discloses most or all of the elements of the issued and originally-filed claims of the '069 patent, and was material to the patentability of the '069 patent.

66.    At least one of the named inventors, Dr. Percival, was aware of the Bingham paper before the issuance of the '069 Patent.

67.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Bingham paper to the PTO and/or intentionally acted to ensure that the Bingham paper was not disclosed to the PTO.

68.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Bingham paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of the application that led to the '069 patent.

**HF Radios and Modems:**

69.    The IDS also did not disclose the existence of high-frequency modems and high-frequency radios ("HF radios and modems").

70.    HF radios and modems have been in existence since as early as the 1960's. Examples of HF radios and modems include an HF radio system called "Piccolo," the KATHRYN system, and marine HF radio.

71.    Because HF radios and modems were offered for sale, sold, made, and used more than one year prior to the actual filing date of the application that led to the '069 patent, they are prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

72.    HF radios and modems disclose most or all of the elements of the issued and originally-filed claims of the '069 patent, and were material to the application that led to the '069 patent.

73.     At least two of the named inventors, Graham Daniels and John O'Sullivan, were aware of HF radios and modems at, before, and during the filing of the IDS and the application that led to the '069 patent.

74.     At least two of the named inventors, as described above, intentionally did not disclose HF radios and modems to the PTO and/or intentionally acted to ensure that these items were not disclosed to the PTO.

75.     At least two of the named inventors, as described above, intentionally did not disclose HF radios and modems to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of the application that led to the '069 patent.

76.     In sum, each of the above described papers and HF radios and modems discloses most or all of the elements of the originally-filed claims of the '069 patent.  Thus, the named CSIRO inventors, as described above, and/or others substantively involved in the prosecution of the '069 patent knew or reasonably should have known that the above described papers and HF radios and modems would have been important to and carefully considered by the examiner in deciding whether to allow the claims.

77.     Despite the high materiality of the above described papers and HF radios and modems and the written acknowledgment by the inventors and CSIRO of their duty to disclose material prior art, none of this prior art was disclosed to the PTO during the prosecution.

**Arguments For Patentability:**

78.     In response to a prior art rejection the PTO examiner entered against the originally-filed claims, CSIRO canceled the originally-filed claims and added new claims in an Amendment filed on June 30, 1995.

79.     In arguing for the patentability of the new claims, CSIRO asserted that the prior art cited by the PTO examiner did not disclose several specific elements of the new claims.

80.     However, all of the specific elements relied upon by CSIRO for its patentability arguments are disclosed in the aforementioned prior art, which was concealed from the PTO.

81.     Thus, the named CSIRO inventors, as identified above, and/or others substantively involved in the prosecution of the '069 patent knew or reasonably should have known that the above described papers and HF radios and modems would have been important and materially relevant to the examiner in deciding whether to allow the claims.

82.     The named CSIRO inventors, as identified above, and/or others substantively involved in the prosecution of the '069 patent acted with culpable intent to mislead or deceive the PTO by withholding known prior art and by making arguments for patentability which could not have been made had the art been disclosed.

83.     In fact, the only prior art that the named inventors disclosed to the PTO consisted of four references that the European Patent Office brought to the inventors' attention during the prosecution of their corresponding European patent application.   As stated in their lone Information Disclosure Statement dated February 3, 1995:  "Such prior art has come to the applicants' attention by being cited in a Search Report issued October 11, 1994 on the corresponding European application ...."  The named inventors did not disclose to the PTO any of the prior art of which they were independently aware.

84.     Upon information and belief, the failure by the named CSIRO inventors, as described above, and/or others substantively involved in the prosecution of the '069 patent to disclose the HF Radios and Modems and the Percival, Barry, Rault, Le Floch, and Bingham papers to the PTO examiner during the prosecution of the '069 patent was done with an intent to

deceive the PTO and constitutes inequitable conduct and a violation of the duty of disclosure, thereby rendering the '069 patent unenforceable.

### Fourteenth Affirmative Defense

85.     CSIRO's requested relief is barred or otherwise limited based on exhaustion, the "first sale" doctrine and/or restrictions on double recovery.


Dated:  May 7, 2008                          Respectfully submitted,

                                             FISH & RICHARDSON P.C.


                                             By:  /s/ Conor M. Civins
                                                  Ruffin B. Cordell (TX SBN 04820550)
                                                  Barry K. Shelton (TX SBN 24055029)
                                                  Conor M. Civins (TX SBN 24040693)
                                                  FISH & RICHARDSON P.C.
                                                  One Congress Plaza
                                                  111 Congress Avenue, Suite 810
                                                  Austin, TX 78701
                                                  Tel:  (512) 472-5070
                                                  Fax: (512) 320-8935

                                                  Jennifer Parker Ainsworth
                                                  State Bar No. 00784720
                                                  WILSON, SHEEHY, KNOWLES,
                                                    ROBERTSON & CORNELIUS, P.C.
                                                  909 ESE Loop 323, Suite 400
                                                  P.O. Box 7339 [75711]
                                                  Tyler, Texas 75701
                                                  Telephone No. (903) 509-5000
                                                  Telecopier No. (903) 509-5092
                                                  Email:  jainsworth@wilsonlawfirm.com

                                             Counsel for
                                             MICROSOFT CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the following counsel of record have been served with a copy of this document via e-mail, per the parties' agreement, on May 7, 2008.

Daniel J. Furniss      Attorneys for COMMONWEALTH
John E. Lord        SCIENTIFIC AND INDUSTRIAL
TOWNSEND AND TOWNSEND AND  RESEARCH ORGANISATION
CREW LLP
379 Lytton Avenue
Palo Alto, CA 94301

S. Calvin Capshaw
CAPSHAW DERIEUX, LLP
1127 Judson Road, Suite 220
Longview, Texas 75601

The undersigned hereby certifies that all counsel of record that have consented to electronic service are being served with a copy of this document via electronic mail on May 12, 2008, per the Court's General Order Regarding CM/ECF Database Technical Failure.

*/s/ Conor M. Civins*
Conor M. Civins